LaRamoke, Judge,
delivered the opinion of the court:
Plaintiffs’ petition is filed in two counts; the first count alleging a Lucas Act[1] claim, and the second count claiming damages for breach of contract arising from an airport construction project at Enid, Oklahoma.
The second amended petition herein was signed by F. M. Hargrave, d/b/a Hargrave Construction Company, for use and benefit of L. B. Fugitt and Carroll Johnston d/b/a Kanotex Construction Company, and two surety companies. Hargrave has no financial interest in any of the claims made.
*76 On March 26,1943, Hargrave entered into a contract with the United States to furnish materials and perform certain construction work at the site of the Enid, Oklahoma, Municipal Airport. This field was to be used by the Air Force as a military field and the construction work included grading, paving, drainage facilities, the building of one new runway, and the lengthening of the other two existing runways, as well as the construction of several taxiways. On March 23,1943, two days before he signed the prime contract, Hargrave entered into subcontracts with A. J. Spicer, sole trader, d/b/a Kanotex Construction Company, for the performance of the work under four items of the contract including the grading, removing and stockpiling of existing blended rock asphalt wearing course, removal of existing gravel base course, laying selected material, and the gravel base course. Fugitt and Johnston were in no way parties to this contract.
Shortly after Spicer entered into subcontracts with Har-grave, Spicer entered into a partnership agreement with Fugitt and Johnston. Spicer contributed his subcontract to this partnership. However, within a few weeks Spicer left the partnership and the subcontract work was from that time all carried out by Fugitt and Johnston, and neither Har-grave nor the defendant was informed that Spicer was not interested in the said subcontract. Hargrave was never informed by Spicer, either orally or in writing, that Spicer had assigned his subcontract to Fugitt and Johnston.
The subcontract work was completed on November 13, 1943, and final payment was signified by a release executed August 12,1944, which reserved Kanotex’s claim. There is no evidence that Fugitt and Johnston have ever asserted any claim or suit against Hargrave.

Ooumb 1

Upon the close of plaintiffs’ proof relative to count 1, defendant moved pursuant to Kule 49 (b)[2] for a dismissal of that count on the ground that plaintiffs had never made a valid request for relief under the Lucas Act, supra. The *77 commissioner of this court made detailed findings of fact and filed a report recommending that defendant’s motion be granted. On the basis of those findings (11 through 21) and our review of the record, we accept the recommendation of the commissioner and dismiss plaintiffs’ claims under count 1 of the petition on the ground that plaintiffs had never filed with the appropriate department a valid request for relief under the Lucas Act, supra. Throughout all negotiations, plaintiffs believed and asserted that the Government, as of right, owed them the amounts claimed. Recovery under the Lucas Act requires that the written request for relief must be such as to apprise the Government that the claim being made was one for extralegal relief outside of any contractual obligation. Fogarty v. United States, 340 U. S. 8; Lawrance Aeronautical Corporation v. United States, 127 C. Cls. 714. Plaintiffs have not met that requirement.

Count %

Under plaintiffs’ breach of contract count, plaintiffs allege five breaches by the Government. For the purpose of this opinion we will refer to each alleged breach separately.
The first is for damages for delay allegedly caused by the Government’s refusal to set stakes for two weeks at the beginning of the contract work.
The record shows that Mr. Russell, dirt foreman for Kanotex, “admitted Kanotex was not delayed because of lack of stakes.”
Section 1-17 (b) of the specifications provided that the Government would furnish “limit marks reasonably necessary for the conduct of the work,” and further provided:
The contractor shall exercise proper precaution to verify the figures shown on the drawings before laying out any part of the work, and will be held responsible for any errors therein that might have been avoided. He shall promptly inform the contracting officer of any errors or discrepancies he may discover in the drawings and specifications, in order that the proper corrections may be made.
Pursuant to these provisions the Government sent a survey party to the site “about two weeks before the prime contract was let to Hargrave” so that “grading cuts and fills” could *78 be measured as provided for in the specifications. Wfien the Goverment’s surveyors were about half finished with their cross sectioning, a Mr. Hill, also a surveyor, and a representative of Kanotex arrived on the site to check the elevations for the plaintiffs. He found little or no discrepancies between the results of his work and those obtained by the defendant’s survey party and, after working and checking for about 10 days, Mr. Hill accepted the defendant’s results. These actions were, thus, in strict conformance with the contract specifications.
On the question of whether plaintiffs were “delayed about two weeks by the defendant’s refusal to set grading stakes,” the evidence shows that the fact is that stakes were not set because it took Mr. Hill that long to check and accept the results of defendant’s survey party. Kanotex had a right to send Hill to the site to check the defendant’s survey results, but this action was taken for the convenience and benefit of Kanotex, and it is not established that defendant’s actions delayed the plaintiffs to any appreciable extent or caused them any damage.
The defendant’s survey party finished its cross sectioning April 2, 1943, while Hill did not leave the site until after that date.
Thus, if there was a delay it was caused by the action of plaintiff Kanotex and not the defendant, and plaintiffs are not entitled to recover on this item of the claim.
The second claim is for overhaul resulting from excess grading not shown on the original plans.
On June 14, 1943, a change order entitled “Modification No. 1” was issued, under article 3 of the prime contract, ordering that the “performance of the work” be adjusted or revised so as to give effect to new grading plans which showed the increased excavation. There was no reference in the modification to payment for overhaul on account of any excess grading. Instead the modification expressly stated that “it is further understood and agreed that all other terms and conditions of said contract shall be and remain the same.” The effect of this language was to provide payment at only the contract price of $0.342 for the excess excavation. This modification, with its absence of any provision for pay *79 ment for overhaul, would normally be conclusive except that plaintiff insists that Modification No. 1 was not accepted and signed until the area engineer stated that signing it would not jeopardize the pending claim for overhaul. The area engineer, Favero, willingly admitted that he had made such a statement.
Defendant says that regardless of the terms of the understanding between plaintiffs and the area engineer, the latter had no authority to make such an agreement and in no event can it be held binding upon the Government.
This position is well taken. Although the area engineer may have been the authorized representative of the contracting officer for limited purposes under the contract, there is no evidence that he had authority to vary the terms of the contract document but only had authority delegated to him by the district engineer and contracting officer, one Col. F. J. Wilson.
The facts in the instant case are almost the same as in the case of Chalker and Lund Co. v. United States, 123 C. Cls. 381, 408, wherein the court said:
This position is well taken. Although the area engineer may have been the authorized representative of the contracting officer for certain limited purposes under the contract, there is no indication either in the contract or elsewhere of any authority in the area engineer, without approval of the contracting officer, to so amend the contract itself by an agreement of this sort. * * * Plaintiff was bound to take notice of the limits of the area engineer’s authority, and the Government is not bound by his unauthorized acts. Kelly v. United States, 116 C. Cls. 811, 817-820.
For the reasons stated, there can be no recovery by plaintiffs on this item of the claim.
Plaintiffs’ third item of claim is for overhauling allegedly resulting from a decision by the Government to keep the airport runways open for “touch-and-go” training landings during the progress of the work.
The record shows that plaintiffs signed Modification No. 5 to the contract providing for such zoning of the field at “no change in the contract cost.” It is not established that the Government area engineer led them to believe that the *80 acceptance of the modification would not prejudice any claim for overhaul. Furthermore, the record shows that when the zoning plan was first announced Kanotex’s Mr. Graham said that the plan advanced “was the same as everbody had agreed to previously” and that Hargrave’s Mr. Lechner stated “Kanotex had indicated to him that if they could not close the runways it would not make much difference to them.” Moreover, neither Hargrave, Fugitt nor Johnston testified that any representative of the defendant had ever told them the field was to be kept closed to flying during the progress of the work, nor that any specific representations about zoning the field were made which affected the Kanotex bids.
Having signed Modification No. 5, which provided for such zoning of the field without “change in the contract cost,” plaintiffs would not now be entitled to recover on the basis of this claim.
Plaintiffs’ fourth item of claim is for overhaul allegedly resulting from “undercutting,” the proposed grading at the south end of the field in order to remove some “unsuitable grading material.”
Modification No. 7 covered this item and provided that plaintiffs were to be paid at the contract price for such yardage required to be undercut. There is no dispute over whether payment was made at the modification price for all the yardage undercut. The findings show that most of the yardage undercut was deposited in fill areas located not more than 1,000 feet away and was not “overhaul” on the excavation undercut within the terms of Modification No. 7. Moreover, the facts show that the $0,342 per cubic yard allowed was adequate compensation for overhaul undercut yardage 1,000 feet or less.
Whether defendant’s area engineer made representations to plaintiffs before Modification No. 7 was accepted by them, which led them to believe that acceptance of the modification would not prejudice any claim for overhaul, is immaterial since it is found there was no overhaul. The authority of the area engineer to bind the Government under those circumstances is also immaterial. Plaintiffs are not entitled to recover on this item of the claim.
*81 Plaintiffs’ fifth item of claim is based upon allegations that defendant’s inspectors prevented the attainment of proper compaction in the subgrading by requiring excessive wetting.
The evidence shows that Kanotex was required to use an excessive amount of water on certain areas to be compacted, making compaction more difficult, and also that unwarranted or improper instructions by defendant’s inspectors were in part responsible for the compaction difficulties. The evidence also shows that plaintiffs’ compaction troubles were caused by a naturally bad soil condition, plaintiffs’ inability to properly handle the drainage and prevent ponding on the site, and lack of sufficient and proper equipment. Thus, it is clear that plaintiffs’ alleged problems were not solely caused by the claimed Government interference.
Even though we may feel that extra costs were incurred by reason of defendant’s actions in requiring Kanotex to use excessive water and making compaction more difficult, it is not possible from the evidence to determine how much of the excess costs resulted from the unnecessary or excessive wetting. This court cannot indulge in speculation, and the testimony gives no clue as to the amount of damage plaintiffs may have suffered as a result of the alleged Government interference. Addison Miller, Inc. v. United States, 108 C. Cls. 513; Kremer v. United States, 116 C. Cls. 358.
The facts show that plaintiffs’ compaction troubles were also caused by “a naturally had subsoil condition,” plaintiff s’ inability to properly handle the drainage and prevent pond-ing on the site, and lacle of sufficient and proper equipment.
Where both parties contribute to a loss neither can recover damages unless there is in the proof a clear apportionment of the loss and the expense attributable to each party. Coath & Goss, Inc. v. United States, 101 C. Cls. 702, 714; Newport News Shipbuilding & Dry Dock Co. v. United States, 79 C. Cls. 25, 36.
Furthermore, there is a serious question as to whether plaintiffs brought their excessive water complaints to the attention of the area engineer. If this was not done, clearly the plaintiffs could not recover.
*82 We are compelled, therefore, to deny recovery on this claim for want of proof.
The defendant has raised several other questions as to the right of recovery by plaintiffs on all the items of count 2 which, in the light of this opinion, we are not called upon to decide.
COUNTERCLAIM
The defendant has filed a counterclaim herein alleging that there is due and owing to the United States by A. J. Spicer, L. B. Fugitt and Carroll Johnston, d/b/a Kanotex Construction Company, withholding taxes, Federal unemployment taxes, and Federal insurance contribution assessments.
There is no dispute over the correctness of the Goverment’s counterclaim and the facts show the total amount due to be $26,401.69.
Under date of March 24,1943, F. M. Hargrave entered into subcontracts with A. J. Spicer, d/b/a Kanotex Construction Company, for the complete performance of certain specified items included in the prime contract and completion and payment bonds were furnished to Hargrave accordingly by Commercial Standard Insurance Company and General Casualty Company of America as cosureties. Shortly thereafter Spicer entered into a partnership agreement with Fugitt and Johnston and within a few weeks thereafter Spicer withdrew from the partnership and all work included under the subcontract was done and completed by Fugitt and Johnston. The contract was satisfactorily completed on November 13, 1943 and final payment was signified by a release executed under date of August 12,1944.
No default by Kanotex occurred in complete performance of the subcontract and the cosureties never at any time entered upon completion of any part of the subcontract.
It was neither briefed nor argued by defendant that the cosureties could be held for any of the taxes claimed under defendant’s counterclaim. Indeed the law is to the contrary, and we assume the Government is not urging the counterclaim against the cosureties.
*83 The other plaintiffs have neither briefed nor argued that they are not liable to the Government for the taxes alleged in the counterclaim and we assume they are not contesting their liability on this point.
Accordingly, we hold that defendant is entitled to recover from plaintiffs L. B. Fugitt and Carroll Johnston, d/b/a Kanotex Construction Company, on the counterclaim in the amount of $26,401.69, plus interest as provided by law.
Madden, Judge; Whitakek, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OE EACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, mates findings of fact as follows:
1. This is an action brought in two counts, the first count being a claim under the Lucas Act, Public Law 657, Chapter 864,79th Congress, Second Session, as amended, 60 Stat. 902, 41U. S. C. A. § 106, and the second count being an alternative count for breach of contract damages. The original petition was filed October 27, 1948, in the name of L. B. Fugitt and Carroll Johnston, d/b/a Kanotex Construction Company, and asserted only the Lucas Act claim. On August 16,1950, the Court allowed a motion for leave to file an amended petition, and on the same day there was filed an amended petition adding the breach of contract count, and adding as party plaintiffs, F. M. Hargrave, d/b/a Hargrave Construction Company, Commercial Standard Insurance Company, and General Casualty Company of America. On October 29, 1952, a second amended petition was filed in the name of F. M. Hargrave, d/b/a Hargrave Construction Company, for use and benefit of L. B. Fugitt and Carroll Johnston d/b/a Kanotex Construction Company, Commercial Standard Insurance Company, and General Casualty Company of America. The Court’s jurisdiction over the second count is alleged to be a contract entered into between F. M. Hargrave and the defendant, acting through the Corps of Engineers, United States Army, on March 26, 1943, and *84 styled No. W 957-eng-1716, hereinafter sometimes referred to as the prime contract.
2. On January 16, 1952, the defendant filed a counterclaim for withholding taxes, Federal Unemployment taxes, and Federal Insurance contribution assessments. On October 29, 1952, plaintiffs filed another amended petition which in substance only changed plaintiffs’ allegations of the amounts, and method of computing, damages. Defendant, on October 80, 1952, filed an answer under the rules of the Court specifically pleading to each allegation made by plaintiffs in their second amended petition.
3. Plaintiff, F. M. Hargrave, is an individual engaged in the general construction business under the firm name and style of Hargrave Construction Company, with his principal office at Cedar Rapids, Iowa, and sues solely for the use and benefit of the other named plaintiffs. He will sometimes be referred to as “Hargrave.” He has no financial interest in any of the claims made.
4. Plaintiffs, L. B. Fugitt and Carroll Johnston are residents of Oklahoma who operated under the name of Kanotex Construction Company. They will, at times, be referred to as “Kanotex.”
5. Plaintiff, Commercial Standard Insurance Company, is a corporation organized and existing under the laws of the State of Texas, with its principal office at Fort Worth, and is engaged generally in the business of undertaking contracts of suretyship.
Plaintiff, General Casualty Company of America, is a corporation organized and existing under the laws of the State of Washington, with its principal office at Seattle, and is engaged, generally, in the business of undertaking contracts of suretyship.
6. The prime contract entered into by Hargrave was a unit price contract under which he agreed to furnish the materials and perform certain construction work at the site of the Enid, Oklahoma, municipal airport. This field was to be used by the Air Force as a military field and the construction work to be performed included grading, paving, installation of drainage facilities, the building of one new runway and lengthening of the other two existing runways, as well as the con *85 struction of several taxiways around the perimeter of the air field.
7. The contract in its pertinent parts provided as follows:
This Contkact, entered into this 26th day of March, 1943, by the Ukited States on Ameeica (hereinafter called the Government) represented by the Contracting Officer executing this contract, and Fred M. Hargrave, an individual trading as Haegeave CoNstbuctioN Co., of the city of Cedar Eapids, in the State of Iowa, (hereinafter called the Contractor), Witnesseth that the parties hereto do mutually agree as follows:
Aetiole 1. Statement of Work. — The contractor shall furnish the materials (except as otherwise provided) and perform the work for Construction of Airfield (Alternate Offer No. 2), Woodring Field, Enid, Oklahoma, as more particularly described in the applicable provisions of the attached specifications, consisting of the items and quantities of work as follows:

for the consideration of the unit price stated opposite each item above-listed, in strict accordance with the specifications, schedules and drawings, all of which are made a part hereof.
Article 2. Specifications and Drawings. — The contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the contracting officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information *86 as he may consider necessary, unless otherwise provided.
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered; Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Article 4. Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
* * Ü: >¡s *
Article 6. Inspection. — (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any places where such manufacture and/or construction are carried on. The Government shall have the right to reject de *87 fective material and workmanship or require its correction. Kejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, * * *.
ARticle 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. * * *
8. The specifications in their pertinent parts provided as follows:
SeotioN I — General Provisions
H* * * ❖ *
1-04. Order of Worh. — The work shall be carried on at such locations and in such order of precedence as may be necessary by the contracting officer, and shall be constructed in every part in exact conformity with the location and limit marks which will be indicated by stakes, lines, marks or otherwise.
Hi # * * ❖
1-06. Drawings.
(a) General. — The work shall conform to the following drawings entitled “Woodring Field, Enid, Oklahoma, Airfield,” with subjects and file numbers as follows:
INDEX TO DRAWINGS

Title File No.

❖ Ht h? ❖ *
Master Plan-EC2-37
Master Plan-EC2-38
# $ $ $
which form a part of these specifications. The originals of these drawings are filed in the U. S. Engineer Office, Wright Building, Tulsa, Oklahoma.
$ ‡ $
1-12. Physical Data. — The drawings which accompany and form a part of this contract have been pre *88 pared on tbe basis of surveys and inspections of the site and are intended to present an essentially accurate indication of the physical conditions of the site. This, however, shall not relieve the contractor of the necessity for familiarizing himself with physical conditions at the site, and any discrepancies found in the drawings shall not be grounds for claims by the contractor against the United States, or for nonperformance of work specifically provided for under the contract.
* * t- * #
1-14. Grounds.
(a) The contractor shall have the privilege of using the Government-controlled land at the site, not otherwise reserved by the United States; provided, that plans for construction, storage or other operations proposed thereon by the contractor shall be submitted for the approval of the contracting officer prior to execution of the work. No Government-controlled buildings are available for use by the contractor as warehouses or workshops.
(b) It is understood that the contractor shall, upon reasonable notice, without expense to the United States, and at any time during the progress of the work when needed for other purposes, promptly vacate and clean up any part of the Government grounds that has been allotted to or has been in use by him, when directed to do so by the contracting officer. The contractor shall keep the buildings and grounds in use by him at the site of the work in a sanitary condition. Suitable and adequate extinguishers ór other fire-fighting apparatus shall be provided for ready use in all buildings erected or in use by the contractor on Government property.
* * * ijc
1-16. Supervision and Inspection.
(a) The work will be conducted under the general direction of the contracting officer and will be inspected, in accordance with Article 6 of the contract, by inspectors appointed by him. The inspectors will keep a record of work done and see that the location and limit marks are kept in proper order; but the presence of the inspectors shall not relieve the contractor or his responsible agent (see Article 8 of the contract) of responsibility for the proper execution of the work.
1-17. Lines, Grades, Stakes, and Templates.
(a) The contractor shall, at his own expense, furnish all stakes, batter boards, templates, patterns, platforms *89 and labor that may be required in setting and cutting, or laying out any part of the work. After lines and Írades for any part of the work have been given by the rovernment inspectors, the contractor will be held responsible for the proper execution of the work to such lines and grades, and all stakes or other marks given shall be preserved by him until their removal is authorized by the contracting officer or his duly authorized representative. The contracting officer may require that work be suspended at any time when, for any reason such marks cannot be properly followed.
(b) The contracting officer will furnish, on the request of the contractor, all location and limit marks reasonably necessary for the conduct of the work.
(c) The contractor shall exercise proper precaution to verify the figures shown on the drawings before laying out any part of the work, and will be held responsible for any errors therein that otherwise might have been avoided. He shall promptly inform the contracting officer of any errors or discrepancies he may discover in the drawings and specifications, in order that the proper corrections may be made.
* * * * *
1-24. Interpretation of Specifications. — On all questions relating to the acceptability of materials or equipment, classification or materials, the proper execution of the work, and the interpretation of the specifications, the decison of the contracting officer shall be final, subject to appeal, as provided for in Article 15 of the contract.
* * * # *
SectioN II — Grading
2-01. Scope of Work. — The work covered by this Section includes the furnishing of all material, equipment and labor required to perform all general excavation, rough or overall or overlot grading, all borrow and fill, and the construction of drainage ditches within the boundary lines of the project as shown on the drawings, as hereinafter specified and as directed by the contracting officer. * * *
*****
2-03. Grading. — The contractor shall perform all excavation of every description and of whatever substance encountered, necessary for and incidental to the completion of the work in the areas to the lines and grades indicated on the drawings, specified herein or directed *90 by the contracting officer. Suitable excavated material shall be used for backfill. Excavated material not required for backfill and unsuitable excavated material shall be disposed of as directed by the contracting officer. Excavation may be accomplished by any customary method. * * *
2-04. Fills. — Fills shall be constructed at the locations and to the lines and grades indicated on the drawings or as directed by the contracting officer, within the limits of the areas indicated on the drawings. Materials placed therein shall be free from all roots and trash and all stones having a maximum dimension greater than 6 inches. Fills shall be formed of excavated material placed in successive layers of not more than 9 inches in depth for the full width of cross section. Each layer shall be thoroughly compacted to 90 percent density as determined by Modified A. A. S. H. O. Method T-99-38, as specified herein, except that directly beneath the select soil A-4 or better subbase of the concrete pavement and/or beneath the select material A-4 or better subbase of the flexible base pavement, the fill for a depth of not less than 9 inches shall conform to the provisions of sub-paragraph 2-06 (d), and shall be sprinkled during placing and rolling, as directed by the contracting officer, to secure optimum compaction. The roller shall have tamping feet uniformly staggered over its cylindrical surface and shall be equipped with a cleaner. Each tamping foot shall project approximately 7 inches from the roller’s cylindrical surface and shall have a face area of from approximately 5 to 9 square inches. The spacing shall be such as to provide approximately 3 tamping feet for each 2 square feet of cylindrical surface. The total weight of the roller in pounds, divided by the total area in inches of the maximum number of tamping feet in one row parallel to the axis of the roller, shall not be less than 250 pounds. The design and operation of the sheep’s foot roller shall be subject to the approval of the contracting officer, and he shall have the right at any time during the prosecution of the work to direct such repairs to tamper feet and minor alterations in the roller as may be found necessary to secure desired compaction for the stability of all constructed fills until the expiration of this contract and shall replace any portion damaged by natural causes, such as storms or cloudbursts, etc., or where the injury is due to his careless or negligent work.
*91 2-06. Preparation of Subbase for Pavements.
* * * * #
(b) Under all flexible base pavement areas, a layer of select material 6% inches in thickness after compaction, having a Public Roads Administration classification of A-4 or better, a plasticity index of from 2 to 12 (with the test made on a slaked sample), and a California Bearing Ratio of not less than 15 percent, shall be spread and compacted to 95 percent of the density at optimum moisture, as determined by the Modified A. A. S. H. O. Method T-99-38. This material is not available on the site and will be paid for under Item No. 30.
(c) In “cut” areas the subgrade directly beneath the select material subbase for the concrete pavement and/or beneath the select material subbase for the flexible base pavement shall be scarified and compacted to a minimum depth of 9 inches to at least 95 percent of the density at optimum moisture as determined by the Modified A. A. S. H. O. Method T-99-38. This operation may be accomplished in one layer without removal or relaying or spreading the subgraded material, provided the required density is accomplished.
(d) In “fill” areas the fill shall be constructed as specified in paragraph 2-04, except that directly beneath the select material subbase tor the concrete pavement, and/or beneath the select material subbase for the flexible base pavement, the subgrade for a depth not less than 9 inches shall be compacted to 95 percent of the density at optimum moisture as determined by Modified A. A. S. H. O. Method T-99-38.
* * * * *
SeotioN XII — Measurement and Payment
12-01. Grading.
(a) Measurement. — A survey of the site of the work will be made prior to the commencement of work under this contract, and the surfaces as determined by the survey will form the basis for the measurement of excavated quantities. Measurement of all grading will be based upon excavated quantities, and will be made between the original ground surfaces and the actual grades to which excavation has been made, provided the excavation has not been carried beyond the prescribed limits authorized by the contracting officer.
ibl Payment.
(1) Payment for all grading, except as designated in subparagraph (2) below, will be made at the contract *92 unit price for Item No. 1, and shall include the cost of excavating and transporting materials to the fill areas; excavating, removing and disposing of unsuitable materials ; the cost of depositing, spreading, sprinkling and compacting the materials in the fills; and the finishing of excavated areas and fills.
*****
12-03. Select Material for Sitábase under Flexible Base Pavement.
(a) Measurement of all select subbase material under flexible base pavement will be based upon the volume of compacted material in place within the limit lines indicated on the drawings.
(b) Payment for furnishing all labor, equipment and materials, and excavating, hauling, placing,_ spreading and compacting select A-4 or better material for the subbase beneath the flexible base pavement will be mads at the contract unit price for Item No. 30.
9. The “Statement of Work” in Article I of the prime contract contains 37 items, each designated by number and stating the approximate quantity, the unit of measurement, designation of nature of work and unit price therefor. Under date of March 24, 1943, Hargrave entered into subcontracts with one A. J. Spicer, sole trader, d/b/a/ Kanotex Construction Company, for the performance of the work under Items 1, 25, 26, 30, and 31, which items included the grading, removing and stockpiling of existing blended rock asphalt wearing course, removal of existing base course, laying select material, and the gravel base course. Under the subcontracts, Spicer was to receive the full amount provided in the prime contract for the items of work to be done by the subcontractor.
10. Shortly after Spicer entered into his subcontracts with Hargrave, Spicer entered into a partnership agreement with L. B. Fugitt and Carroll Johnston. Spicer contributed his subcontracts to this partnership. Within a few weeks Spicer got out of the partnership and the subcontract work was from that time on carried out by Fugitt and Johnston. Hargrave never signed any new subcontracts with Fugitt and Johnston, and neither Hargrave nor the defendant was informed that Spicer was not interested in the subcontracts. Hargrave was never informed by Spicer, either orally or in writing, that Spicer had assigned his contract to Fugitt and Johnston.
*93 LUCAS ACT CLAIM
11. As is stated in Finding 1, plaintiff’s original petition, filed October 22, 1948, set forth a claim by Kanotex alone under the Lucas Act, Public Law 657,79th Congress, Second Session, and Executive Order 9786. There Kanotex claimed net overall losses in the amount of $295,370.98. The losses are alleged to have arisen in the performance of certain work as a subcontractor under Hargrave in the construction of Woodring Airfield, Enid, Oklahoma. The original claim was submitted to the area engineer by letter dated June 1, 1943, from Hargrave on behalf of Kanotex. This claim was for excess costs due to over-hauls over and above that contemplated by the contract. In its pertinent part it stated:
This will acknowledge receipt of revised plans covering construction of Woodring Airfield, Enid, Oklahoma, Contract No. 957-eng-1716, which revised plans were received by us some week or ten days ago.
We have just made an analysis of the earth work as shown on the revised plans, this being item 1, of the contract and this analysis indicates to us that there is quite a difference in the grading as set forth on these plans, over that shown in the original plans from which the job was bid. According to our analysis there is quite an increase in yardage of from possible 20% to 25%, also a very noticeable change in cut and fill sections which changes have increased the haul necessary to balance the dirt to such an extent that the over-haul is quite an item.
*****
Further, the fact that we have been restricted in our operations in order that this field be kept open for use as an auxiliary landing field has increased our haul in dirt moving operations.
In view of the above we feel that we should receive two cents per yard station on over-haul which over-haul should be the average haul as determined from the original plans from which the job was bid.
12. On June 16, 1943, Hargrave was advised by the Area Engineer that it would be necessary to furnish further information before action could be taken on the claim. Modification No. 1, dated June 14, 1943, to the prime contract, was subsequently accepted by Hargrave on June 22,1943. This modification on its face was accepted without reservations *94 and provided for revisions in grading and drainage which had given rise to the contractor’s claim. Several more letters passed between Hargrave and the defendant in an effort to obtain or provide sufficient data for a determination of the claim. Other letters asserted other claims for extra compensation due to the necessity of undercutting various areas to remove unsuitable soil material. The language of some of these letters is pertinent. On June 10, 1943, Kanotex wrote a letter to defendant stating:
We suggest that a change order be issued authorizing the excavating and back-filling with select material where necessary which operations would be paid for under terms 1 and 30 of the contract and thereby prevent delay in completing the sub-grade.
and on July 23, 1943, plaintiffs wrote defendant stating:
We wish to call your attention to the fact that we are forced to undercut quite a large portion of the runways and taxiways and replace the material removed with top soil in order to get the required compaction. It is our opinion that this extra excavation and fill should be paid for under our contract with the Hargrave Construction Company at the price per cubic yard of $.34.
13. On September 2, 1943, Major Goodman of the Corps of Engineers, in acknowledging one of plaintiffs’ letters furnishing additional information on the claim for overhaul, stated in an introductory sentence:
Reference is made to your letter of June 21, 1943, relative to claim for additional compensation under subject contract, in the amount of two cents per station yard.
14. After the correspondence referred to in the three findings preceding this one, the District Engineer and contracting officer on April 24, 1944, made a decision denying the claim. This denial was based on the fact that Modifications Nos. 1 and 5, providing for revisions of the contract price, were signed without reservation or protest on June 22 and June 26, 1943, respectively, and subsequent to the date the original claim was made. Plaintiffs allege that these modifications were signed under duress and after a promise made by Government representatives that such signing would not *95 preclude prosecution of the claim. Both allegations were denied by the District Engineer.
15. Hargrave, by letter dated May 15,1944, appealed to the Secretary of War under the provisions of Article 15 of the contract, adopting Kanotex’s claim as his own, and attaching a letter dated May 13, 1944, containing an “amended” claim of Kanotex, and requesting that it be considered. This amended claim of Kanotex included four more items of additional compensation for additional grading quantities, additional overhaul on water, additional cost of compaction, and additional equipment costs, and was increased from approximately $80,000 to $393,658.28.
16. On May 29,1944, the contracting officer made findings of fact as to the original two items of the claim. On September 6, 1944, the attorney for the prime contractor requested of the contracting officer a complete finding of fact covering all items in order to facilitate consideration of the appeal by the War Department Board of Contract Appeals. By letter dated September 30, 1944, the District Engineer denied the claim in its entirety, stating in detail the various facts and provisions of the contract upon which he relied. Appeal to the Secretary of War was taken by letter dated October 2,1944, as to all items involved in the claim.
17. The claim was considered and a decision rendered on behalf of the Head of the Department by the Board of Contract Appeals under date of June 30, 1945. The Board of Contract Appeals denied the appeal as to all items except the claim for additional cost of compaction and stated that it had no jurisdiction over the compaction claim because it involved unliquidated damages for alleged unwarranted interferences with Kanotex in the performance of its subcontract. However, the Board of Contract Appeals made a finding to the effect that the actions of the contracting officer were not arbitrary or capricious.
18. On February 7,1947, plaintiffs submitted a claim under the Lucas Act to the War Contract Hardship Claims Board. The claim was in the amount of $295,370.98. On April 29, 1948, the War Contract Hardship Claims Board dismissed plaintiffs’ Lucas Act claim on the grounds that none of the documents relied on by plaintiffs were “written requests for *96 relief” under the provisions of the First War Powers Act, 1941 and Executive Order 9001, as amended, but were instead “written with reference to additional compensation to which claimants deemed themselves entitled as a matter of legal right under the provisions of the contract.”
19. At the trial before the Commissioner it was shown that plaintiffs suffered net-overall losses of $270,873.48. But it was also shown that plaintiffs had never heard of the First War Powers Act, that they asserted their claims as a matter of right under the Article 15 of the contract, and that they were in no way asking for a matter of equitable grace or a “gift.”
20. It was not conclusively established that Mr. Fugitt had listed all of his Government contracts in the Lucas Act claim filed February 7,1947. It was shown that Fugitt had another contract under his own name alone for the apron work at the Enid airfield. In addition Fugitt did other Government contract work at Texarkana, Arkansas, and at Coffeyville, Kansas. Any profits or losses on these contracts, which were not further identified, should have been considered in computing plaintiffs’ net-overall losses, or profit, on all Government contracts and subcontracts performed during the statutory period of the Lucas Act. There was no showing by plaintiffs that this was done.
21. The complete list of written communications referred to by plaintiffs and defendant in connection with the motion to dismiss the Lucas Act Claim under Rule 49 (b) is as follows:
1. Letter from F. B. Lechner, Coordinator, The Hargrave Construction Co. to the Area Engineer, P. O. Box 1552, Enid, Oklahoma, dated June 1,1943, stating in part as follows:
Mr. Fugitt of the Kanotex Construction Company submitted the following information to this office on May 27th:
“This will acknowledge receipt of revised plans covering construction of Woodring Airfield, Enid, Oklahoma, Contract No. 957-eng-l7l6, which revised plans were received by us some week or ten days ago.
“We have just made an analysis of the earth work as shown on the revised plans, this being item 1, of the contract and this analysis indicates to us that there is quite a difference in the grading as set forth on these plans, over that shown in the original plans from which the job was *97 bid. According to our analysis there is quite an increase in yardage of from possible 20% to 25%, also a very noticeable change in cut and fill sections which changes have increased the haul necessary to balance the dirt to such an extent that the over-haul is quite an item.
“We notice on sheet No. EC2-38.1 ‘The Master Plan’ that modification No. 1 of Contract 957-eng-l7l6 is to accompany the revised plans, although no such modification has been received. Further attention is called to the revisions made, which revisions show a change to the extent that taxi-way LX has been added and finished contours and drainage revised. In connection with the NE SW runway as shown on the revised plans, you will notice that there is a large fill section along the east side of the runway. As a matter of fact, however, from Station 18+00 to approximately Station 40+00 there was considerable excavation made in this same section.
“Further, the fact that we have been restricted in our operations in order that this field be kept open for use as an auxiliary landing field has increased our haul in dirt moving operations.
“In view of the above we feel that we should receive two cents per yard station on over-haul which over-haul should be the average haul as determined from the original plans from which the job was bid.”
* # * * St
2. Letter of June 10, 1943, from F. B. Lechner, Coordinator, The Hargrave Construction Co. to the Area Engineer, P. O. Box 1552, Enid, Oklahoma, reading as follows:
Mr. Fugitt of the Kanotex Construction Company submitted the following information to this office on June 6,1943:
“In preparing or compacting the sub-grade, we find that there is a spongy condition existing in spots more or less throughout the entire area of the work. This, in our opinion, is due to the fact that the soil in these various locations is extremely light and fluffy, without body. Also, in our opinion, the majority of the field is under-layed with red shale, commonly known as redbeds which prevents ground water, which has been excessive recently, from seeping and draining off through natural channels of drainage, thereby holding the moisture, and unless these soft, spongy spots are excavated and filled with soil of the nature of select material as set forth as Item 30 of the contract, there will be considerable delay during the evaporation period.
*98 “We would suggest that a change order be issued authorizing the excavating and backfilling with select material where necessary which operations would be paid for under Items 1 and 30 of the contract and thereby prevent delay in completing the sub-grade.”
3. Letter of July 23,1943, to Mr. A. J. Favero, Woodring Airfield, Enid, Oklahoma, from the Kanotex Construction Company, reading as follows:
We wish to call your attention to the fact that we are forced to undercut quite a large portion of the runways and taxiways and replace the material removed with top soil in order to get the required compaction. It is our opinion that this extra excavation and fill should be paid for under our contract with the Hargrave Construction Company at the price per cubic yard of $0.34.
It is our understanding that you have cross-sectioned the areas excavated and refilled, and can give us the information as to the amounts so handled.
4. Letter of September 2,1943, to the Hargrave Construction Company from Major P. F. Goodman, Corps of Engineers, Chief, Operations Division, in the absence of the District Engineer, stating in part as follows:
[Reference is made to your letter dated 21 June 1943, relative to claim for additional compensation under subject contract in the amount of two cents ($0.02) per yard station alleged overhaul.
Beference is made to master plans Nos. EC2-38 and EC2-38.1, along with the analysis for dirt movement anticipated under original and revised plans which were attached to the above-mentioned letter in support of claim previously made under letter dated 1 June, 1943. Your attention is directed to the sheet “Original Analysis of Earth Quantities for Bid Purposes,” attached to the above-mentioned letter. It is the opinion of this office that haul distances therein set forth were computed in error across existing runways and that a balancing of mass, cut against fill, was not considered in arriving at your ultimate conclusion. As examples, cut section designated 1-C does not appear adequate to provide all dirt necessary to complete fill section designated 2-F; and, the estimated haul distances of 1,200 feet as therein set forth from cut section designated 2-C to fill section designated 1-F was computed directly across the existing N-S runway. An effort should be made at this time to *99 correct tbe computations for station yard haul as actually experienced.
Therefore, it is requested that you revise your station yards computations comparable to prevailing conditions before further consideration is made of subject claim.
*****
5. Letter of May 13,1944, from the Kanotex Construction Company to the Hargrave Construction Company, Cedar Eapids, Iowa.
This letter is one which reviews in considerable detail the various factors which were deemed to affect the performance of the work undertaken by Kanotex and to warrant a claim for additional compensation. These factors will be summarized in view of the length of the communication.
* * * we believe that the arbitrary and capricious performance of the Area Engineer throughout progress of the work was largely responsible for the long and expensive delay in completion which we have had to bear by the combination of reasons, consisting of arbitrary and delayed rulings by the Area Engineer, untimely and delayed changes in the plans and by further changes in the plans resulting from errors in the original engineering data upon which the bid and contract were made.
* * * * *
* * * about the time operations were started we were orally informed that our plan of operation must be changed to permit use of the air field for training student flyers; we stated further that several verbal requests had been made for written instructions of this change without result and that since our cost of operation would be materially increased such instructions were necessary to permit us to estimate our increased cost and request a change order accordingly. * * *
* * * we stated that excavation quantities had apparently been increased from 20 to 25 percent involving-changes in cut and fill sections which materially changed haul distances. * * * We stated further that due to the restriction in our operations by reason of opening the field to air traffic that haul distances were further increased and request was made for additional payment for over-haul based on the difference between the revised plans and the bid and contract plans.
*100 Modification order No. 1, dated June 14th. and denominated “Change Order” was signed in your name by Frank Lechner under apparent date of June 22, 1943. We consistently refused to approve or accept this, order insofar as we were affected and stated our position in several conferences in your field office from June 19th to June 22nd, the date the order was signed. In one or more of these discussions the Area Engineer stated, and we were informed of his statements at other times to the same effect, that acceptance of this change order denoted only acceptance of plans and would not preclude or prejudice our claim for overhaul or other increased cost due to changes in the plans which were purportedly transmitted by this change order.
# # # # sj«
* * * While we were still engaged in attempting to produce a showing as accurate as possible under the circumstances of the increased over-haul and of other changes by reason of which additional compensation would be claimed, you have furnished us copy of letter dated April 24, 1944, addressed to you by the District Engineer, in which claim for compensation for additional overhaul is denied.
$ $ $ $ *
In order that you may have in your hands all pertinent and necessary information useful in connection with an appeal or amendment, amplification or modification of the claim heretofore filed, we furnish you herein a complete statement of changes and extensions made in the contract with additional costs resulting for which we are claiming reimbursement from you.
After analyzing the bases of the claim for additional compensation, the following corrected tabulation (after modification during the course of the hearing before the Board of Contract Appeals) was submitted by the plaintiffs:
Additional Grading 24,181 cu. yds. @ .3420_ $8,269.90
Additional Overhaul on Grading 2,067,247 sta. yds. @ .020- 41,344.94
Additional Overhaul on Base and Select materials 1,562,730 sta. yds. @ .020- 31,254.60
Additional Overhaul on Water 785,102 sta. yds. @ .030_ 23, 553. 06
Additional cost of Compaction_ 70,000.00
Additional equipment cost on Grading 331,586 cu. yds. @ 300_ 99,475.80
Total_ 273,898.30
*101 There was attached to this lengthy communication of May 13, 1944, various letters between the parties including one dated June 21,1943, from A. J. Favero, Associate Engineer, Area Engineer, U. S. Engineer Area Office, Enid, Oklahoma, which reads as follows:
The District Office has requested the following additional information, in regards to your claim submitted to this office requesting a $0.02 per yd. increase on Item No. 1, as set out in your letter of June 1,1943, to the Area Engineer:
1. Yardage and haul under original plans.
2. Yardage and haul under revised plans.
3. The average distance of haul increase due to said change.
It is requested that this information be plotted on the Master Plans of subject contract enclosed herewith and returned with a letter of transmittal containing pertinent data in regards to your claim, within the next eight (8) days.
This communication of May 13,1944, is the one which was particularly emphasized at the trial before the Commissioner by plaintiffs’ attorney as the basis for the claim for relief under the Lucas Act. It is noted that this letter makes no reference to a claim for extra-legal relief as such. None of these letters were considered by the War Hardships Claim Board to be requests for relief under the First War Powers Act of 1941, and the Executive Order No. 9001, as amended, pending and not disposed of by the contracting officer on August 14,1945. A statement to this effect was included in the decision of that agency representing the Department of the Army dated May 11, 1948. It was also pointed out in such decision that the procedures adopted by the parties for disposition of the claims for additional compensation were procedures prescribed in the contract and agreed to by the parties.
BREACH OR CONTRACT CLAIM
22. The prime contract required that work be started within one calendar day after notice of award, and that it be completed on or before August 13, 1943. The contract specifically provided that there were to be no liquidated damages assessed if the work was not completed within the time *102 set. The contract work was actually completed on November 13,1943.
23. The Kanotex breach of the contract claim, apart from the Lucas Act claim, is composed of five elements. These elements are (1) a claim for damages caused by the defendant’s alleged refusal to set grade stakes for two weeks at the beginning of the contract work, thereby delaying Kanotex, (2) a claim for overhaul because of excess grading not shown to be required by the original plans, (3) a claim for overhaul caused by the closing of the airport runways to plaintiffs’ vehicles in order that military planes stationed nearby could use the runways for touch and go landings, (4) a claim for damages caused when defendant’s inspectors allegedly made employees of Kanotex add too much water to the sub-grade, thereby delaying the attainment of proper compaction, (5) a claim for overhaul and excess excavation caused by the necessity of undercutting the grade at the south end of the north-south runway in order to extract certain spongy, unstable, dirt material found there.
24. On March 17,1943, about two weeks before the prime contract was let to Hargrave, the defendant sent a survey party to the Enid Municipal Airport to check the elevations of the field in order to cross-section the field and establish a grid system for the area so that grading cuts and fills could be accurately measured and described by co-ordinates. This was provided for in the specifications. This survey team used as its topographical maps the existing “as built” plans of the Municipal Airport. These “as built” plans were the Master Plan diagrams numbered EC2-37 and EC2-38 referred to in paragraph 1-06 of the specifications. EC2-37 showed the north half of the field and EC2-38 showed the south half. The cross-sectioning of the field started March 20, 1943, and was completed April 2, 1943, and the results showed that the elevations shown on diagram EC2-37 were in error and that there was actually approximately 32,000 cubic yards more excavation than was shown on the diagram.
25. About one week after defendant’s survey party arrived at the site, and when the defendant’s party was about half finished with the cross-sectioning, a Mr. Hill, also a surveyor, and a representative of Kanotex arrived on the site to check *103 the elevations for the plaintiffs. He found little or no discrepancies between the results of his work and those obtained by the defendant’s survey party, and after working and checking for about ten days, Mr. Hill accepted the defendant’s results.
26. "When Mr. Hill came on the site, Mr. Favero, the Government Area Engineer, notified Hargrave and asked that Mr. Hill’s1 surveys be carried out far in .advance of any grading operations so as not to delay the grading. Mr. Favero during this time was urging Kanotex to get its equipment on the job, and was anxious for the excavation to get started. He did not think Hill’s work was necessary.
27. Plaintiffs complain that they were delayed about two weeks by the defendant’s refusal to set grading stakes for the commencement of excavation. The fact is that the stakes were not set until the second week in April because it took Hill that long to check and accept the results obtained by defendant’s survey party. The defendant was ready to set grading stakes for Kanotex and other subcontractors on the job any time after its own cross-sectioning was completed on April 2, 1943, and did, in fact, set stakes for the drainage contractor as early as March 27th. After Hill left the job, Mr. Kussell, dirt foreman for Kanotex, told Mr. McGee, the Chief of operations under the area engineer, to set stakes for the commencement of grading operations on the new northeast-southwest runway that was to be built. The stakes were immediately set, and Kanotex commenced operations the next day. Kussell admitted Kanotex was not delayed because of lack of stakes.
28. Kanotex had a right to send Hill to the site to check the defendant’s survey results, but this action was taken for the convenience and benefit of Kanotex, and it is not established that defendant’s actions delayed the plaintiffs to any appreciable extent or caused them any damage. The defendant’s survey party finished its cross-sectioning April 2, 1943, while Hill did not leave the site until after that date.
29. When the results of defendant’s survey of the site showed there was a greater amount of excavation than was disclosed on the plans originally incorporated into the specifications, the defendant prepared new grading plans showing *104 the increased cubic yardage of excavation. The new diagrams were numbered EC2-37.1 and EC2-38.1, and were made available to Kanotex during May 1943. They showed that there were approximately 32,000 cubic yards of excavation more than originally estimated.
30. On June 1, 1943, Hargrave wrote the area engineer transmitting information furnished by Kanotex, in which request was made for additional compensation of $0.02 per station yard of overhaul[3] resulting from the increased excavation shown on the revised plans and from restrictions in operations at the field by reason of the fact that plaintiffs’ trucks were not allowed to cross the existing runways at the airfield. It was contended that such restricted use of the field increased Kanotex’s haul and dirt moving operations and that Kanotex “should receive $0.02 per yard station on overhaul, which overhaul should be the average haul as determined from the original plans from which the job was bid.”' Hargrave’s letter of June 1, 1943, was forwarded to the district engineer who, through the area engineer, on June 21st, advised Hargrave that additional information was needed with regard to the claim, and requested “(1) yardage and haul under original plans, (2) yardage and haul under revised plans, and (3) the average distance of haul increase due to said change.” On July 3, 1943, Hargrave and Kanotex in a jointly-signed letter forwarded to the area engineer two schedules purporting to show the relative quantities and distances of earth haul, figured from the original plans and from the revised plans.
31. On June 14,1943, a change order entitled Modification No. 1 was issued, under Article 3 of the prime contract, effectuating the changes made by the newly revised plans, EC2-37.1 and EC2-38.1. The change order stated in part that since “additional information from the field indicates that it is necessary to change certain grades to conform to existing conditions * * * you are hereby ordered to make adjustments, and/or revise the performance of your work as may be required to effect the above-designated changes in your contract” (and) “as indicated in the following revised *105 drawings * * * EC2-37.1, titled ‘Master Plan,’ supersedes E02-87.” The penultimate paragraph of the modification stated, “It is further understood and agreed that all other terms and conditions of said contract shall be and remain the same.” This modification was accepted and agreed to in writing by Hargrave on June 22,1943. There was no reference in the modification to payment for overhaul on account of any excess grading. Plaintiffs insist that Modification No. 1 was not accepted and signed until the Area Engineer stated that the signing thereof would not jeopardize the pending claim for overhaul. The area engineer willingly admitted that he had made such .a statement.
32. At the trial the parties submitted evidence concerning the distances, quantities, method of computing and reasonable costs of the alleged overhaul. Plaintiffs conceded that they had already been paid the contract price of $0.34 per cubic yard for the increased 32,000 cubic yardage of excavation shown by the revised plans. But, in addition, plaintiffs claim payment of $0.02 per station yard for overhaul on the extra yardage, and claim that it was carried a distance of about 47.5 stations, or 4,750 feet. If paid, this claim would give plaintiffs an additional sum of $43,574, or approximately $1.36 per cubic yard for the increased yardage. When there is added to this figure the $0.34 per cubic yard which plaintiffs admit they have already received for the excess yardage, plaintiff’s total claimed price for the increased yardage shown on the revised plans amounts to $1.70 per cubic yard.
33. Defendant’s position on the issue of payment for overhaul on the extra yardage is that (1) the area engineer did not have authority to make any representations to plaintiffs which can invalidate the effect of plaintiffs’ having signed Modification No. 1, (2) that overhaul is never paid on an airport construction project, and no reasonable contractor would ever expect to receive such payment, and (3) that plaintiffs’ figure of $1.36 per cubic yard in addition to the already-paid contract price of $0.34 per cubic yard is exorbitant and unreasonable.
34. It is not established that the area engineer had authority to vary the terms of a contract document but only had *106 the authority delegated to him by the district engineer and contracting officer, one Colonel F. J. Wilson. This authority was limited to making of purchases not exceeding $500 in value, approving shop-drawings provided they did not vary the plans or specifications, approving materials, and approving certain personnel replacements. It is shown by the record that the plaintiffs were never informed by defendant of the limited extent of the authority which had been delegated to the area engineer.
35. Defendant’s witnesses stated that they had never heard of additional payment being made for overhaul on an airport construction project, and one of plaintiffs’ witnesses admitted that in his experience he knew of no instance in which overhaul had ever been paid on an airport job. It, therefore, appears that any substantial payment above the $0.34 per cubic yard paid plaintiffs for the excess excavation in the north end of the field would be an exception to the general engineering practice in the Enid, Oklahoma, area during the time here involved.
36. If it is determined that plaintiffs are entitled to pay for overhaul of the extra excavation, it is considered that plaintiffs’ claim of $0.02 per station yard is excessive. Defendant utilized several expert witnesses, asking each one to assume that overhaul was to be paid for the carrying of 32,000 cubic yards of dirt over a 5,000 foot distance. They generally used normal overhaul rates used in highway construction work about 1943 and reached results which were quite similar. The highest estimate obtained in this manner was $7,326.00 as against plaintiffs’ figure of $43,574.00. It is considered that a reasonable amount for this extra work would be approximately $10,000.00.
37. Kanotex claims that its plan of operations under the sub-contracts was disrupted by defendant’s decision, after the work had started, to use the airfield for military flight operations. Kanotex claims that consequently the length of haul was increased beyond that contemplated in its bid, thereby resulting in additional costs for such hauling, and for which additional compensation is sought.
38. In support of this claim, Kanotex states that it originally planned the contract work as a short-haul job, and as *107 a result of the zoning of tbe airfield the operation became a long-haul job for which Kanotex had to rent additional and more expensive equipment. The subcontractor also states that its representatives were affirmatively told before the contract was let that the airfield was not to be used for flying during the contract work and that Kanotex could use the runways as roads for its vehicles. Lastly, plaintiffs claim that Hargrave’s signing of Modification No. 5 on June 26, 1943, providing for zoning of the field without any payment of any additional compensation, should not bar their claim for overhaul caused by zoning because the area engineer had promised that such signing would not prejudice their then pending claim.
39. Modification No. 5 stated in substance that it had been determined that since construction work should be confined to certain areas in order to allow free and safe airfield operations on a portion of the field at all times, it was necessary, and in the best interests of the United States, to modify the contract by revising paragraph 1-04 of the contract specifications, entitled “Order of Work,” to provide that the work should be carried on in such locations and in such order of precedence as may be found necessary by the contracting officer, “and conforming to the work zones shown on drawing entitled Work Zones,’ dated April 22,1943.” The work zone drawing referred to above was attached to the modification and it was provided further that such revision be accomplished “as directed by the contracting officer.” The modification also provided that there would be no change in the contract cost on account of the modification and that all other terms and conditions of the contract “as heretofore modified by properly authorized changes and/or agreements, shall be and remain the same.”
40. Although evidence offered by plaintiffs was to the effect that they did not know of the zoning of the field until near the middle of April 1943, after their bid had been made and the work started, it appears that they had planned to use some long-haul equipment on the job. Some of the earth-moving equipment brought to the site consisted of dump trucks and elevating graders which are usually considered in the trade to be long-haul equipment and which had been rented by *108 Kanotex for work on the subcontract as early as February 1943. As Kanotex owned no trucks and elevating graders, it had to rent all such equipment that it planned to use. The trucks and elevating graders were among the first equipment which Kanotex delivered to the site, and they arrived about April 1st. It appears, therefore, that plaintiffs had long-haul equipment on the site before the date on which they first heard of the zoning order changing the job from short-haul to long-haul. It is not established by the evidence that plaintiffs had planned originally to use short-haul equipment only. It is established, however, that these restrictions on the use of the airfield more than doubled the average haul required by the plan of operation originally contemplated by plaintiffs.
41. It was the understanding of Hargrave before bids were submitted for work involved in this action that the flying field would not be open for flying operations and that the contractor would be free to cross the runways or use them as roads for his vehicles. The field had not been zoned at the time plaintiffs’ bid was made. When operations began there was free access to the field and it was possible to cross the landing strips at will. This procedure was followed for a brief period before the order was issued to the effect that the airfield would be used by the Army. After that, the driving of vehicles of any kind across or along the landing strips was prohibited. Hargrave testified that he did not know what factors were considered by Fugitt and Johnston in preparing their bid as he did not participate in its preparation. He did testify, however, that he knew of his own knowledge that the bid was made on the basis that the entire field could be used in performing the work involved. Hargrave also testified that a man whom he met at the airfield, prior to the contract bidding, told him that the field was1 to be closed to flying, but he stated that his informant was not a representative of the defendant.
42. Fugitt testified in substance that he did not discuss the question of zoning with any representative of the defendant prior to the submission of the Kanotex bid. He said he inspected the site on two different days prior to the bid, but talked only to the private operator of the field. No military *109 planes were seen. Fugitt said be did not think zoning had to be discussed because he thought the specifications were clear on that point. He further testified that from a study of the specifications and from his observations on the site for two days, he “was satisfied that the whole field could be used”.
43. Johnston testified that before the bid he talked to a man at the hangar who said the field was to be closed and that he saw a couple of private planes and was told that they were going to move out. He saw no evidence of Army planes. About two weeks later he heard that the field was to be used for military training. He did not claim that he was told by any representative of the defendant that the field would be closed.
44. Witnesses for defendant testified that military and civilian planes were using the Airfield before April 1, 1943. It is to be noted, however, that Modification No. 5 was not issued until June 3, 1943, and these changes in contract specifications were explained as follows:
It has been determined that since construction work should be confined to certain areas in order to allow free and safe airfield operations on a portion of the field at all times, it is necessary and in the best interest of the United States to modify said contract in certain particulars as follows: * * *
45. The record does not establish that any specific representations about zoning the field were made to Hargrave, Fugitt, or Johnston, by any representative of the defendant which affected the Kanotex bids.
46. It was provided in the Specifications, Section 1-14, Grounds, that “The contractor shall have the privilege of using the Government-controlled land at the site not otherwise reserved by the United States; * * The restrictions of which the plaintiffs complain were not placed on the use of the airfield until after the bid was made and the contract signed. Hargrave, Fugitt and Johnston were all of the opinion that there would be free use of the entire airfield and there was nothing on the plans or in the specifications which restricted the contractors’ operations in the handling of the earthwoi’k. At a meeting in the office of the Mayor of Enid, Oklahoma, attended by representatives of the de *110 fendant and plaintiffs, prior to any work being done, Mr. L. B. Fugitt explained what his operations would be and the details of each operation discussed. It was not suggested or intimated by anyone at the meeting that the operations would be restricted so as to preclude the crossing of existing runways.
At the prebid conference, held in Tulsa on March 23,1943, at which Hargrave and Kanotex were represented, there was no discussion about whether the airfield would be open or closed to flying during the contract work.
47. On April 19,1943, after the contract work was under way, a meeting was called to discuss the issuing of a modification which would incorporate a zoning plan for the field. A Mr. Frank Lechner represented Hargrave at this meeting, and a Mr. Paul Graham represented Kanotex. At the time of the trial before the Commissioner, both men were dead, but their testimony given at the hearing before the Board of Contract Appeals was admitted. The defendant was represented at this meeting by the Area Engineer, Favero, his Chief of Operations, McGee, and Mr. Pate, a representative of the District Engineers Office at Tulsa. At this conference Mr. Pate presented a plan of zoning the field so that the work could be carried out while flying training operations continued. Kanotex made no objection to the zoning plan as announced, and Mr. Graham said that the plan advanced by Mr. Pate was the same as everybody had agreed to previously. Lechner’s testimony before the BCA was to the effect that Kanotex had indicated to him that “if they could not cross the runways it would not make much difference to them.” It is not established that in the later discussion of zoning there was any claim that Modification No. 5 should include a provision for additional compensation, although plaintiffs insist they were told by a representative of the defendant that signing such modification would not prejudice a claim for overhaul.
48. Military planes were using the field at or soon after the beginning of the contract work. There was nothing unusual about continuing flying operations during construction work on a project of this kind, but it is unusual to fail to *111 inform a contractor if it is known or anticipated that such use will be made of a flying field.
49. On the basis of the complete record, it is found that Mr. Favero, defendant’s Area Engineer, did make representation to the plaintiffs before Modifications Nos. 1 and 7 were accepted by them which led them to believe that the acceptance of these modifications would not prejudice any claim for overhaul due to the conditions which were involved in these changes but the record is not sufficient to establish that Favero made the same representation with respect to Modification No. 5. The evidence likewise fails to show that defendant was guilty of duress or fraud in connection with plaintiffs’ acceptance of Modification No. 5.
50. Kanotex was at times required by defendant’s inspectors and the Area Engineer to use an excessive amount of water on certain areas to be compacted, making compaction more difficult, and Kanotex was required to use discs in aerating the dirt after too much water was used. This resulted in some delay in completing the work and added an indeterminate amount to the cost of this phase of the operation. There is no indication that defendant intentionally required more water than was actually needed in any instance.
51. The undercutting in certain areas at the south end of the field is the subject of Modification No. 7, which was accepted by plaintiffs on August 10,1943. Modification No. 7 stated that it had been determined that unsuitable subgrade material had been encountered in the extension of the North-South Runway and Taxiway No. VI, and that it was necessary to modify the contract to the effect that all subgrade material encountered in the construction of such extension of taxiway, which could not be compacted to meet the requirements of the contract specifications, should be removed and replaced by suitable material obtained from sources approved by the contracting officer. By the modification, the contract price for performing all the work, together with the equitable monetary adjustments required to effect the revisions designated under this change order, was increased by $6,840, an approximate sum based upon a unit price of $0,342 per cubic *112 yard for an estimated 20,000 cubic yards of such unsuitable material to be undercut.
52. With respect first to the claim for overhaul on the cubic yardage of excavation required to be undercut under the provisions of Modification No. 7, there is no dispute over whether payment was made at the modification price of $0,342 per cubic yard for all yardage undercut. The final pay estimate shows that Kanotex was paid $105,182.51 for 807,000 cubic yards of excavation. These figures compare with the original contract specification figures and the Kanotex bid of $81,600 for 240,000 cubic yards of excavation. Kanotex was thus paid $23,532.51 for 67,000 cubic yards of excavation in excess of that contemplated by either its bid or the specifications. As has been stated in Finding 24, 32,000 cubic yards of this excavation was in the north end of the field, and the balance was mostly undercutting.
53. Most of the undercutting which was done was necessary to cope with the unstable conditions described in Modification No. 7. This undercutting was originally proposed by Kanotex.
Some undercutting, however, was done in the course of the subcontractor’s “method of operation,” and not because of the existence of any unsuitable soil conditions. One such instance involved approximately 800 cubic yards in the north end of the field.
54. Since plaintiffs were paid the contract price for the yardage undercut, it is in order to determine whether there should have been any payment for overhaul on the undercut yardage. Overhaul is not usually paid on airport projects. Most of the yardage undercut was taken from areas at the south end of the north-south runway and from Taxiway 5, and deposited in fill areas located not more than 1,000 feet away. Actually there was no overhaul on the excavation undercut within the terms of Modification No. 7. The $0,342 per cubic yard allowed appears adequate compensation for hauling undercut yardage 1,000 feet or less.
55. Although plaintiffs filed written claims with the defendant during the time of the contract period for the excess *113 grading, the alleged overhaul due to zoning the field for flight operations, and the required undercut excavation, they did not file a written claim with respect to the compaction problem.
It is established, however, that plaintiffs had difficulty obtaining proper compaction. This difficulty was due, in part, to unwarranted or improper instructions by defendant’s inspectors to apply water in excess of what plaintiffs thought was necessary. The difficulty was also due partially to other factors, including a naturally bad subsoil condition, plaintiffs’ inability to properly handle the drainage and prevent ponding on the site, and lack of sufficient and proper equipment.
Neither the contract nor the specifications stated or estimated the amount of wetting or the number of passes of the sheepsfoot roller that would be necessary, and for obvious reasons. It did provide for such amount of wetting and such number of passes of the roller as were necessary to obtain the required compaction. How much wetting was required in a particular case was a question of fact. Plaintiffs never brought this matter to the attention of the contracting officer through the medium of a claim in writing and, accordingly, he never passed on the question. The matter was, however, brought to the attention of inspectors who represented the contractor on several occasions before it was finally determined that undercutting was necessary to remove soil which could not be properly compacted. It is not possible in view of the conflicting evidence to determine how much of the excess costs resulted from the unnecessary or excessive wetting in attempting to attain proper compaction.
56. On the question of the running of the statute of limitations, it is found that the contract work was completed November 13,1943, that final payment was signified by a release executed August 12, 1944, which reserved Kanotex’s claim. The administrative processes were completed by the decision of the War Department Board of Contract Appeals on July 7, 1945, and plaintiffs’ breach of contract count was filed, amending its original petition August 16,1950.
*114 ACTION ON DEFENDANT’S MOTION
57. On the basis of the facts set forth herein, defendant’s counsel at the conclusion of plaintiffs’ evidence moved to dismiss the Lucas Act count of the petition under Rule 49 (b) of the Rules of this Court, and the granting of that motion is recommended by the trial commissioner.
58. Defendant’s counsel also moved to dismiss the breach of contract count of the petition at the conclusion of plaintiffs’ proof on the grounds that (1) the statute of limitations had run, and (2) that Fugitt and Johnston were not proper parties to sue because Hargrave’s subcontract was with A. J. Spicer trading as sole trader, that this status had never been changed, and there was therefore no privity between Fugitt and Johnston and Hargrave which would, enable Hargrave to sue for the use of the other two men. This motion of defendant was denied by the Commissioner, who at the same time directed the defendant to proceed to present its proof, all of defendant’s witnesses being immediately available.
defendant’s counterclaim
59. Plaintiffs L. B. Fugitt and Carroll Johnston, d/b/a Kanotex Construction Company, are indebted to defendant for Federal Unemployment Taxes of $9,886.55; Withholding Taxes of $12,505.72, and Federal Insurance under the Federal Insurance Contributions Tax Act of $4,009.42, or a total of $26,401.69, plus any interest which may be applicable.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are not entitled to recover and the petition is dismissed.
Defendant is entitled to recover from plaintiffs L. B. Fugitt and Carroll Johnston d/b/a Kanotex Construction Company, on the counterclaim the amount of $26,401.69, plus interest as provided by law.

 60 Stat. 902, as amended 62 Stat. 869, 992, 41 U. S. C., § 106, note.

 Now 49 (c) (3)i under our present Rules wliich were adopted October 15, 1953.

 1 cubic yard moved 100 feet.