JoNes, Ghief Judge,
delivered the opinion of the court:
This is a suit for damages for alleged breaches of contract and for delays in payment which plaintiff asserts occurred during the performance and completion of the contract in question.
On February 4, 1947, the plaintiff signed a contract with the Bureau of Ships of the Department of the Navy, which was approved by the Navy Department on February 20,1947. It was a cost-plus-a-fixed-fee instrument by the terms of which plaintiff was to make investigations, studies, and analyses of pilotless aircraft guidance and control systems, to complete such work before June 30, 1947, and to make reports thereon. The pertinent provisions of the contract are set out in finding 2.
By the terms of the original contract the maximum amount to be expended, including the fixed fee, was limited to the sum of $149,205.68. It was also provided that no payments in excess of this amount should be made unless the maximum amount to be expended was increased in writing by the contracting officer.
The nature of the allowable costs is set out specifically under Section A of the schedule annexed to the contract, which section is stated in full in finding 2.
*53 Section 4 (a) of tbe contract, also set ont in finding 2, provides the method of approval of certain items of expenditure, and also provides for prior approval by the contracting officer as a condition to reimbursement for certain specified items.
The contract was officially transferred to the Bureau of Aeronautics in May 1947. After such transfer there were from time to time nine amendments to the contract, which are set out in finding 3. A number of these amendments increased the maximum expenditure permitted under the contract. They also, to some extent, changed the scope of the contract.
The time for performance was extended to October 31, 1947, but plaintiff completed the technical work and delivered the reports required by the contract on September 30, 1947, and they were accepted by the Government about December 19,1947.
In addition to the amount paid by the Navy, plaintiff claimed that various amounts were due him under the contract. A number of these claims were rejected by the contracting officer. Plaintiff made ten appeals to the Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals, which will be referred to herein as the Board. Five of such appeals are involved in this action. Including the sums paid the plaintiff pursuant to the decisions in five of the appealed cases, plaintiff has been paid a total of $317,325.80.
Plaintiff asserts that additional sums are due him under the contract in the amount of $38,258.44. The items are shown in finding 5.
Plaintiff also seeks recovery of $150,000 as unliquidated damages allegedly resulting from defendant’s failure to pay invoices submitted by plaintiff within the 30-day period stipulated in Section 3 (c) of the contract.
This is largely a factual case. Nearly 800 pages of testimony were taken before the trial commissioner and, in addition, numerous exhibits were filed as evidence. The analyses which the commissioner has made of the five appeals and the problems involved therein are clear, detailed, and correct. They are set out in full in finding 7, et seg. With *54 very minor changes, we have approved the findings of the trial commissioner and we will not repeat the details of these findings.
It will be noted that the Board went into the subject matter thoroughly and made certain allowances to plaintiff in addition to those which had been approved by the contracting officer.
Plaintiff alleges that the action of the Board was arbitrary, capricious, and not supported by the evidence, but a careful review of the evidence shows that the Board was meticulous and careful in analyzing the evidence and that it increased allowable costs when such action was justified.
One of plaintiff’s claims is for precontract expenses allegedly incurred during the three months immediately preceding the contract date. Until Amendment No. 4 was adopted, shortly before the date the contract ended, it contained no provision for the payment of precontract expenses. By that amendment plaintiff was allowed reimbursement for costs expended in anticipation of the contract, provided such costs were of the kind that would have been paid under the terms of the contract if they had been incurred during its existence. Under this amendment the Navy cost inspector approved a total of $7,398.56 out of the claim of $15,266.83. On appeal the Board outlined certain principles to be followed in recomputing the precontract costs but did not fix the amount thereof. Thereafter, the Navy recomputed these costs and paid plaintiff the total due him under the Board’s decision except the sum of $1,450.52, which we have found to be the additional amount due plaintiff as precontract expenses.
Plaintiff also seeks recovery of $4,630 as personal expenses spent on the items shown in finding 16. These items are claimed in addition to the $10 per day subsistence paid to the plaintiff. They involved theater tickets, lunches, magazines, and conference meals above the regular per diem allowance. The major part of the item of nearly $4,000 consisted of expenditures for luncheons and dinners for the plaintiff and his employees and consultants during the year 1947.
The Board held that the contract contained no express or implied provision for reimbursement of the cost of the con *55 ference meals as a direct cost; that they were not shown to have been reasonable and necessary to the performance of the contract, and that, at any rate, such expenditures were normally regarded as administrative expenses for which plaintiff had been reimbursed through payments made pursuant to the negotiated 55 percent overhead rate provided for in the contract. We agree.
Plaintiff also claims $700 as a fee which he paid to a certified public accountant. The Navy paid plaintiff for the fees he paid to outside accountants for services they rendered during the performance of the contract and for some time thereafter. The $700 additional now sought by plaintiff covers a fee for accounting services which were rendered nearly a year after the contract ended and for the purpose of enabling plaintiff to prosecute his appeals on claims which had been denied by the Navy. We agree with the Board that there is no legal basis for the recovery of this accounting fee.
As additional job costs, plaintiff claims the sum of $20,438.71. Payment of these additional costs was first requested from the Navy in January 1948, several months after the contract had ended, but they were not itemized until September 8, 1948, when plaintiff submitted a final invoice. After denial of the claim by the Navy, the Board concluded that the additional job costs requested by plaintiff were either direct costs of the kind which were not allowable under the terms of the contract, or were indirect costs which had already been paid plaintiff in a settlement covering his overhead costs. The evidence, which we have set out in our findings, fully supports this determination.
Under Section A (a) (9) plaintiff claims $5,360.47 in addition to the sum of $13,501.23 which he has been paid by the Navy for expenses incurred in the operation of his privately owned aircraft. In the appeal on this claim, the Board remanded the case to the Navy with instructions to recompute the amount due plaintiff in accordance with the principles stated in its decision. As a result, additional payments were made by the Navy, and we have determined that this claim has been satisfied in full except for the sum of $162.30.
*56 In addition to the above claims, the plaintiff seeks recovery of general damages in the sum of $150,000 on the ground that defendant breached the contract by delaying the payment of plaintiff’s monthly invoices beyond the 30-day period specified in the contract, and by excepting to numerous items included in plaintiff’s bills. As set out in detail in findings 46, 47, 48, and 49, the payments were to be made on monthly invoices.
There is no doubt that many of the payments were delayed beyond the period of 30 days. However, both the contracting officer and the Board found that frequently the plaintiff failed to submit the essential statements and proof of the expenditures, and that he submitted a number of items which could not be allowed, which tended to delay payment; and also that plaintiff in many instances made the expenditures without getting approval in advance, as provided by the contract. The plaintiff was allowed a number of these items even though under the strict terms of the contract they would not have been paid. At the same time, since the expenses had been actually incurred, the Board in many instances permitted the payment when proper proof was made.
These delays were to some degree attributable to both parties: to the plaintiff because of his failure to secure advance approval of certain listed expenditures for which such procedure was required, for failing to authenticate fully the expenditures at the time of the submission of the invoices, and for including some items not reimbursable under the contract. On the other hand, the defendant in some instances unnecessarily delayed the payments. There is no way to apportion the degree of blame which should be attributed to either party, and in these circumstances recovery cannot be allowed. Hargrave v. United States, 132 C. Cls. 73 (1955).
It has been repeatedly held that, except under special circumstances, recovery for delay in payment of the amount due under a contract is limited to an allowance for interest.
It is also well established that interest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute. Neither of these conditions is found here. Tillson v. United *57 States, 100 U. S. 43 (1879); Ramsey v. United States, 121 C. Cls. 426 (1951).
As of February 11, 1948, the plaintiff had invoiced the Navy for a total of $352,131.38, although at that time the contract maximum was $270,756.68. However, after auditing plaintiff’s boohs to determine whether or not the additional amounts were allowable expenses, plaintiff was paid an additional amount of $11,648.18, bringing the total payment to $268,049.11. On June 11 and 22,1948, the maximum amount of the contract was increased to $350,000. After further auditing, an additional payment of $13,611.23 was made to the plaintiff. As a result of appeals to the Board on disputed accounts, plaintiff received the four payments detailed in finding 51.
On June 29, 1949, the parties negotiated a written settlement by which plaintiff received $26,500 on his claim for postcontract expenses. Plaintiff thus received a total of $317,325.80.
Plaintiff earnestly asserts that his report was an added expense. However, it will be found by examining the contract that plaintiff was required to make a final report. In fact, it was the final objective of the contract. Insofar as the expenses of the preparation of this report are concerned, such items as were shown by the evidence to have been expended were allowed and payment was made therefor. As already stated, both precontract and postcontract expenses were paid to the extent that these were justifiable.
Plaintiff bases his claims for recovery on the ground that the actions by the Board were arbitrary and capricious. However, in studying the record as a whole, we find that the Board was not only considerate, but was in some respects liberal in allowing certain items of cost that could not be or were not clearly proved. At any rate, the Board thoroughly considered every item claimed and we find no basis for holding that actions by the Board were arbitrary, capricious, or not supported by substantial evidence.
There is no doubt that this was an unfortunate experience for the plaintiff. As of April 30, 1946, plaintiff had about $45,000 in cash in banks and owned 2,000 shares of stock which he had acquired at a cost of more than $70,000. His *58 organization had offices in several cities. Sometime in July-1946 or prior thereto, plaintiff pledged 2,000 shares of stock to a bank as collateral security for money loaned to him for financing operations under the contract. In June 1948 the bank notified plaintiff that it had sold the stock for the sum of $50,169.37 and applied the proceeds of the sale to his outstanding indebtedness. About May 1948 plaintiff’s financial condition was such that he was compelled to close his offices, with the exception of the Dallas office.
The contract in question did not require plaintiff to devote his full time to the contract work, and only about 55 percent of the time of his regularly employed personnel was spent on the Navy contract. Plaintiff had planned to secure a considerable amount of outside work while the contract was being performed, but it developed that the expenses he incurred in endeavoring to secure outside work far exceeded the income from that source. In fact, plaintiff wrote the Secretary of the Navy in May 1948 that his expenses for other than Navy work amounted to $30,000; that the income from outside sources amounted to only a little more than $4,000, and that his loss on noncontract work during that period was $25,000.
Apparently plaintiff was somewhat careless in not securing prior approval for certain types of expenditures, where such prior action was required. He spent some money unnecessarily on entertainment and was not sufficiently careful in establishing the monthly items of expenditure. Nevertheless, he was apparently a capable man in his field, rendered satisfactory work to the Navy, and was entitled to receive the amounts which he has been paid.
Whether our judgment on the many items considered by the Board would be exactly the same is a question which is not before us. After a review of the record, we are satisfied that the Board carefully and thoroughly considered each claim and that its decisions are fully supported by the evidence before us. We find nothing in the record to justify an affirmative determination of arbitrary or capricious action on the part of the Board.
Plaintiff has not shown by a preponderance of the evidence that the damages sustained by the loss of his stock and *59 the liquidation of his four offices were the direct and proximate results of the defendant’s breach of contract. His engineers and other personnel employed in his five offices had almost one-half of their working time available for the solicitation and handling of non-Navy business. There is no evidence in the record as to what outside business plaintiff could or would have obtained, or the profits he would have earned therefrom had there been no delay by the defendant in reimbursing plaintiff for the costs which he incurred under the contract.
On the basis of the findings plaintiff is entitled to recover the following:
1 percent reserve withheld by defendant_$3, 500.00
Balance of precontract costs_ 1,450. 52
Balance of private aircraft expense_ 162.30
Total_ 5,112.82
Plaintiff will be given judgment in the sum of $5,112.82. It is so ordered.
Laramoke, Judge; Madden, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. On June 29, 1946, the Bureau of Ships of the Department of the Navy issued a Letter of Intent to plaintiff, a consulting engineer, who accepted and signed the letter on the same date. The letter signified the intention of the Navy-Department to enter into a cost-plus-a-fixed-fee contract with the plaintiff, whereby plaintiff was to make investigations, studies, and analyses of pilotless aircraft guidance and control systems, and to complete such work before June 30, 1947.
The Letter of Intent was superseded by the formal cost-plus-a-fixed-fee contract, which was dated June 29, 1946, but was not signed by plaintiff until February 4, 1947, nor approved by the Navy Department until February 20,1947.
In May 1947, cognizance of the contract was officially trans *60 ferred to the Bureau of Aeronautics, the technical bureau primarily concerned with procurement, and the number of the contract was changed at the same time.
2. The contract and the annexed schedule contained the following pertinent provisions:
GENERAL PROVISIONS
Section 1. (a) The Contractor shall furnish to the Government the research and development services, re-gorts, plans, prototypes or other articles specified in the ehedule or specified, if the Schedule permits, in task orders issued in accordance with the provisions of the Schedule. Requirements so specified are hereinafter referred to as “the work.”
(b) The rights and obligations of the parties to this contract shall be subject to and governed by these General Provisions, the Schedule, any Task Order issued in accordance with the Schedule, and any specifications incorporated into this contract. In resolving any inconsistency between any of these parts of this contract, the order of precedence shall be as follows: the Schedule, the General Provisions, Task Orders, detailed specifications incorporated into the contract by reference, and general specifications incorporated into the contract by reference. References in these General Provisions to “this contract” or “the Schedule” include, where appropriate, task orders issued in accordance with the provisions of the Schedule.
Section 2. (a) It is estimated that the total cost to the Government for the full performance of this contract will not exceed the maximum amount specified in the Schedule. The Contractor shall use its best efforts, but does not guarantee to complete the performance of the work within such maximum amount.
(b) After the amounts payable to the Contractor have equaled such maximum amount, the Contractor shall not be required to continue the performance of the work unless and until such maximum amount shall have been increased by the Contracting Officer of this contract, and payments under this contract, in absence of such increase, shall not exceed such maximum amount.
Section 3. (a) Elements of Compensation
As compensation for the work, the Government shall pay to the Contractor “allowable costs” as defined in these General Provisions and the Schedule plus such fixed fee, if any, as may be specified in the Schedule *61 which fixed fee shall be payable at such times as may there be specified.
(b) “Allowable Costs'”
“Allowable costs” shall constitute the costs, other than such “overhead expenses” as may be specified in the Schedule, incurred by the Contractor in the performance of this contract and accepted by the Bureau of Supplies and Accounts as chargeable hereunder in accordance with sound accounting practice.
(c) Payment
Once each month the Contractor may submit an invoice supported by a statement of cost incurred by the Contractor for such items in the performance of this contract and claimed to be includible in allowable costs. Such invoices and statements of cost shall be in such form and reasonable detail as the Bureau of Supplies and Accounts shall require. The statements of cost shall be certified by two officers or other responsible officials of the Contractor, one of whom shall be a principal executive officer and one of whom shall be a person supervising accounting under this contract. Promptly after submission of each interim invoice and statement of cost, the Government shall make provisional payment, except as provided below, of the amount shown thereon. At any time or times prior to final payment on account of allowable costs the Bureau of Supplies and Accounts shall make such audit of the invoices and statements of cost as it shall- deem proper. Each provisional payment shall be subject to reduction to the extent of amounts included in the related invoice and statement of cost which are found not to constitute allowable cost and shall also be subject to reduction for over-payments or to increase for underpayments on preceding invoices. As soon as practicable after submission by the Contractor of the final invoice and statement of cost, the Government shall pay any balance of allowable cost. All disputes concerning allowable cost under this contract shall be decided by the Chief of the Bureau of Supplies and Accounts, subject to written appeal by the Contractor within thirty (30) days to the Secretary of the Navy, whose decision shall be final and conclusive.
(d) Final Release
After payment of eighty percent (80%) mum amount, further payments shall be withheld, until a reserve of one percent (1%) of the total maximum amount but in no event more than one hundred thousand dollars ($100,000.00) shall have been set aside, such reserve to be paid to the Contractor at the time of final *62 payment. The Contractor and each assignee under an assignment in effect at the time of final payment shall execute and deliver at the time of and as a condition precedent, to final payment, a release in form and substance satisfactory to and containing such exceptions as may be found appropriate by the Contracting Officer, discharging the Government, its officers, agents and employees of and from liabilities, obligations and claims arising under this contract.
SectioN 4. (a) The Contractor shall obtain the prior approval of the Contracting Officer as a condition precedent for reimbursement for any of the following :
1. Any subcontract or purchase order which involves research or development work. The Contractor shall refer each prospective subcontract or purchase order which might involve such research or development work to the Contracting Officer, who shall determine whether or not such approval is required.
2. Any subcontract or purchase order for, or otherwise incurring the cost of fabricating purchasing or installing items costing one thousand dollars ($1,000.00) or more which are considered to be capital equipment in accordance with sound accounting practice consistently followed by the Contractor.
3. Expenses or obligations incurred in connection with the construction, alteration, or restoration of any building.
4. Expenses or obligations incurred in connection with the purchase, rental or other acquisition of real property or affixation of property to realty in such manner as to cause the same to become or be deemed real property.
.5. Expenditures or obligations incurred in connection with the purchase of motor vehicles.
6. Any subcontract or purchase order which may involve the payment of more than one thousand dollars ($1,000.00).
(b) The Contracting Officer may, in his discretion, ratify and approve any of the above, subsequent to the purchase or expense; such action shall constitute ful-filment of the approval requirement of this section.
(c) .Approval obtained as required by this section shall in no way relieve the Contractor of any of its obligations assumed under this contract, nor shall it be construed to authorize the allowance of any cost under this contract which would not be allowable if such approval were not required.
*63 (d) No subcontract or purchase order shall provide for payment on a cost-plus-percentage-of-cost basis or the payment of a fixed fee in excess of seven percent (7%) of the estimated cost, exclusive of fee.
‡ $
SeotioN 20. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within thirty days to the Secretary of the Navy, whose decision shall be final and conclusive. Pending decision, the Contractor shall diligently proceed with performance.
* # # * *
SCHEDULE
Letter of Intent NObsa-30188 dated 29 June 1946, as amended, was issued in anticipation of the execution of this contract. This contract supersedes such Letter of Intent and constitutes the entire agreement between the parties. All authority to act under said Letter of Intent thereunder is hereby terminated. However, all authorizations given or other actions taken under and pursuant to the Letter of Intent shall be considered as having been given or taken under this contract, and all gublic vouchers and invoices, if any, submitted to the rovernment and all payments made to the contractor under the Letter of Intent are to be regarded as submitted and made hereunder.
* * * * *
DisbursiNG : The Contractor shall submit invoices to the Supervisory Cost Inspector, Eighth Naval District, New Orleans, Louisiana, for approval and forwarding to the Chief of the Bureau of Ships, Code 946, for certification. Preparation of public vouchers and payment will be made by the Central Navy Disbursing Office, Bureau of Supplies and Accounts, Navy Department, Washington, D. C.
Inspection : Under the cognizance of the Inspector of Naval Material, USN, Baltimore, Maryland.
Period oe contract: The work under this contract shall be completed by 30 June 1947, unless extended in writing by the Chief of the Bureau of Ships.
Maximum amount (Including Fixed Fee): $149,205.68. (Under Section 2 (b) of this contract, no payments in excess of this amount shall be made unless *64 the amount is increased in writing by the Contracting Officer.)
The Contractor will notify the Contracting Officer of the date when in the Contractor’s estimation the maximum amount will be expended. Such notice shall be given within sixty (60) days prior to such date.
SeclioN a — Specific compensation provisions
The Government shall pay to the Contractor for the performance of work under this contract the following:
(a) As Allowable Costs:
1. Materials purchased directly, withdrawn from the Contractor’s store or stockroom or fabricated by the Contractor for the performance of this contract, credit to be given to the Government in each case for any surplus or scrap at current prices, whether or not the surplus or scrap is sold.
2. Salaries and wages of personnel directly employed in the performance of this contract, including premiums paid for overtime hours worked by direct labor under this contract, if such overtime is expressly authorized by the Chief of the Bureau of Ships.
3. Communication expense, including long distance telephone calls and telegrams, incurred directly in the performance of this contract, but excluding expense of local telephone calls.
4. Expenditures for outside professional services directly related to the performance of this contract.
5. Subcontracted work or services in connection with the performance of this contract.
6. Expenditures by the Contractor necessary for the performance of its undertakings hereunder for the travel expenses of employees directly engaged therein, plus the reasonable actual subsistence expenses in an amount not exceeding ten dollars ($10.00) per person per day of such persons incurred during the period of travel or, at the Contractor’s option in the case of employees directly engaged in the performance of its undertakings hereunder, an allowance in lieu of the actual subsistence expenses of such employees not exceeding six dollars ($6.00) per person for each calendar day or major fraction thereof during the period of travel; Provided, That expenses for travel hereunder by motor vehicle other than common carrier or rented automobile shall be reimbursed on a reasonable actual expense basis, or at the Contractor’s option on a mileage *65 basis at a rate not exceeding five cents (5‡) per mile per vehicle, in lieu of the actual expenses of such travel.
7. Expenditures for additional security expenses of a nature not already being incurred by the date of this contract and resulting from Navy security requests, provided such additional security expenses are incurred after approval by the Chief of the Bureau of Ships.
8. Subject to limitations specified in Section 4, expenditures for furniture and furnishings, in an amount not to exceed one thousand dollars ($1,000.00), in connection with the performance of this contract.
9. Expenditures incurred for the use of Contractor-owned private aircraft required for the performance of this contract, charged in accordance with a sound accounting method consistently followed by the contractor.
10. All costs not excluded by other provisions of this contract, which in the opinion of the Contracting Officer, should be included in the cost of performing this contract, and any such cost shall be specifically certified by the Contracting Officer as being allowed under this subparagraph.
(b) As Overhead Expense:
To cover all overhead, indirect charges and all elements of cost excluded from or not covered by paragraph (a) of this section, (herein collectively referred to as “overhead expense”), an amount, in lieu of the actual cost thereof, equal to a percentage, to be negotiated between the Contractor, and the Contracting Officer prior to 31 December 1946, of the salaries and wages (excluding overtime premiums) paid under and covered by subparagraph (a) 2 of this section. The percentage established pursuant thereto shall be evidenced by an amendment. In the event of failure to agree upon such percentage, the matter shall be determined pursuant to the section of this contract entitled “Disputes”, upon the basis of the overhead expense attributable to this contract in accordance with sound accounting principles.
Pending negotiation or determination of such percentage, payments on account of overhead expense shall be made on the basis of forty-eight and one-tenth percent (48.1%). After agreement or determination of the percentage to apply to this contract, subsequent payments shall be adjusted, or other adjustments made, to compensate for any resulting overpayment or underpayment.
*66 (c) As a Fixed Fee:
In addition to all other amounts payable under this contract, the Government shall pay a fixed fee of Nine Thousand Six Hundred Thirty Dollars and Sixty-eight Cents ($9,630.68), payable in six (6) monthly installments as follows:
One Thousand Six Hundred Five Dollars and Thirteen Cents ($1,605.13) on 1 January 1947 and One Thousand Six Hundred Five Dollars and Eleven Cents ($1,605.11) on the first day of each month thereafter, to and including June 1947.
SbctiON b — Disputes as to allowable costs
All disputes concerning questions of fact as to allowable costs arising under this contract shall be decided by the Chief of the Bureau of Supplies and Accounts, and all other disputes concerning questions as to the purpose and the necessity of the work giving rise to the cost incurred under this contract shall be decided by. the Contracting Officer subject to written appeal in either case by the Contractor within thirty (30) days to the Secretary of the Navy, or, duly authorized representative whose decision shall be final and conclusive.
:!: * * *
On February 20,1947, the date on which the Department of the Navy executed the contract, it was amended by deleting the word “Promptly” in Section 3 (c), line 12, and substituting therefor the words “Within thirty (30) days”.
3. After cognizance of the contract was transferred to the Bureau of Aeronautics, there were nine amendments to the contract as follows:
Amendment No. 1, dated June 28,1947, but not received by plaintiff until July 24, 1947, extended the contract completion date to August 31, 1947, and increased the maximum amount of the contract by $73,500, or to a total of $222,705.68, with no change in the fixed fee.
Amendment No. 2, dated August 29, 1947, increased the fixed fee of the contractor to $12,135.68 and raised the maximum amount of the contract (including the fixed fee) by $48,051, or to a total of $270,756.68. This amendment also modified the scope of the contract to provide for engineering liaison with various manufacturers regarding the study and analysis of pilotless aircraft guidance control systems.
*67 Amendment No. 3, dated July 28,1947, adds subsection 11 to Section A (a) of the schedule and provided as follows:
11. Travel and subsistence of Mr. S. W. Marshall, Jr., and Mr. A. B. Liles, Office Manager, when in connection with this contract, with subsistence at the rate of $10.00 per diem.
This amendment also substituted the following for Section A (b) of the schedule:
(b) As Overhead Emperne
To cover all overhead, indirect charges and all elements of cost excluded from or not covered by paragraph (a) of this section, including salaries and bonuses of Messrs. S. W. Marshall, Jr., and A. B. Liles, Office Manager, (herein collectively referred to as “overhead expense”), an amount, in lieu of the actual cost thereof, equal to 55% of the salaries and wages (excluding overtime premiums) paid under and covered by subpara-graph (a) 2 of this section.
On or about 1 July 1947 the overhead percentage rate specified in this paragraph (b) of Section A may be revised at the request of either party hereto. Within thirty (30) days after any such request, the contracting officer and the Contractor shall establish by negotiation such revision, if any, in the overhead percentage rate as shall be equitable under the circumstances, which revision shall be set forth in an amendment to this contract signed by the contracting officer and the Contractor. Any such revision of the overhead percentage rate shall be applicable only to the succeeding period of the contract. Any failure on the part of the contracting officer and the Contractor to agree on the overhead rate for the succeeding period of the contract after a request for a revision thereof shall be a dispute concerning a question of fact within the meaning of the section of this contract entitled “Disputes”; pending settlement under such section, the Contractor shall diligently proceed with performance.
Amendment No. 4, dated September 8,1947, added a new subsection 12 to Section A (a) of the schedule to provide that allowable costs under the contract would include the following:
12. All costs which have been incurred by the Contractor in anticipation of this contract and prior to the signing thereof, and which, if incurred after the sign *68 ing of this contract, would have been considered as items of allowable cost under this Section.
Amendment No. 5, dated February 16,1948, amended sub-paragraph (a) 10 of Section A of the schedule to permit the contractor to recover as a direct charge to the contract the negotiated sum of $9,739.50 for the expenses of idle time incurred by the contractor while his personnel were being cleared by the Navy to handle classified material.
Amendment No. 6, dated June 11,1948, increased the maximum amount of the contract by $15,000, or to a total of $285,756.68, with no increase in the contractor’s fixed fee.
Amendment No. 7, dated June 22, 1948, increased the maximum amount of the contract by $64,243.32, or to a total of $350,000, with no increase in the contractor’s fixed fee.
Amendment No. 8, dated June 30, 1949, recognized as legitimate costs of performance certain expenses connected with the administration of the contract that were incurred from October 31, 1947, when the contract ended, to April 1, 1948, and approved a negotiated settlement in the amount of $26,500 for such postcontract expenses.
Amendment No. 9, dated September 27, 1954, approved a settlement in the amount of $1,593.93 to reimburse the contractor for expenses incurred for Christmas bonuses, vacation bonuses, and vacation salaries for the calendar year 1947.
4. The time for the performance of the contract was extended to October 31,1947, but plaintiff completed the technical work and delivered the reports required by the contract to the Navy on September 30, 1947. These reports were accepted by the Government about December 19,1947.
5. Because of defendant’s refusal to pay plaintiff various amounts which he claimed to be due him under the terms of the contract, he made ten appeals to the Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals, hereinafter referred to as the Board. Only five of such appeals are involved in this action. Including the sums paid the plaintiff pursuant to decisions rendered in five of the appealed cases, plaintiff has been paid a total of $317,325.80. In this action, plaintiff asserts that the additional amount due him under the terms of the contract is $38,258.44, which consists of $3,500 withheld by defendant pursuant to Section 3 *69 (d) of the contract and admittedly due plantiff, plus five claims in the amounts and categories of costs as follows:
(a) Precontract Expense — $3,629.26.
(b) S. W. Marshall, Jr., Expense Account — $4,630.
(c) Accountant’s Fees — $700.
(d) Additional Job Costs — $20,438.71.
(e) Private Aircraft Expense — $5,360.47.
Besides the amounts claimed to be due under the terms of the contract, plaintiff seeks recovery herein of $150,000 as un-liquidated damages for breach of contract.

Precontract Expenses

6. The basic contract did not provide for the payment of precontract expenses. The Navy Department, however, recognized that plaintiff had incurred certain costs in preparation for the contract and agreed to Amendment No. 4, which is quoted in finding 3.
In November 1947, after Amendment No. 4 had been executed, plaintiff submitted an invoice under which he claimed $15,266.83 for precontract expenses allegedly incurred during April, May, and June 1946, the three months immediately preceding the contract date, June 29,1946. The Navy cost inspector reviewed these charges, approved items for payment totaling $7,398.56, and disallowed other items aggregating $7,868.27. On the basis of the cost inspector’s approval, the defendant paid plaintiff $7,398.56 on August 16, 1948. Plaintiff appealed the disallowances to the Chief of the Bureau of Supplies and Accounts, and submitted a “Statement of Fact” which was agreed to by plaintiff and the cost inspector, and which set forth the various items claimed by plaintiff, the amounts allowed, and the costs disallowed. While the disallowances were being reviewed, the Bureau was informed by the contracting officer that the overhead rate specified in the contract was not intended to apply to the precontract period and that, subject to audit, plaintiff should be allowed his actual overhead expenses for that period.
Following an audit of plaintiff’s records, the Bureau prepared its own determination of costs and their allocation, and on this basis calculated an overhead rate of 58 percent of *70 labor costs. As a result, it was decided that plaintiff was entitled to $85.08 more than had been allowed and paid.
7. Plaintiff appealed the decision of the Bureau, and on January 31,1950, the Board handed down an opinion which did not contain a final decision as to the amount due on plaintiff’s claim for precontract expenses. However, in its opinion, the Board criticized certain cost determinations and allocations made by the Navy cost inspector and adopted by the Bureau, laid down principles to be followed in recomputing the precontract costs, and remanded the case to the Bureau for appropriate action in accordance with the decision rendered.
8. In the agreed “Statement of Fact,” submitted to the Bureau and to the Board, there appeared the following detailed statement of precontract expenses claimed by plaintiff and the treatment accorded the components thereof by the Navy cost inspector:
Per contractor's claim Allowed by cost inspector Disallowed by cost inspector
Direct labor. $5,032.60 $2,836.10 $2,196.50
Overhead.. 3.607.85 1.659.86 2,047.99
Idle labor._.-. 0
Direct costs etc.:
Subsistence. 401.25 401.25
Transportation....... 1.384.86 1.384.86
O ommunications.... 4.30 4.30
Small expense..... 8.72 8.72
Direct costs claimed as expenses of S. W. Marshall, Jr., and based on his personal memoranda: Subsistence.. 530.00 530.00
Transportation.... 722.90 649.67 73.23
Conference expense — Meals... 891.10 891.10
Small 23.80 23.80
15,266.83 7,398.66 7,868.27
9. Plaintiff’s claim of $5,032.60 for direct labor includes $2,196.50, which represents the total salaries of plaintiff and his office manager for the three-month period preceding the date of the contract. The cost inspector disallowed the $2,196.50 as direct expenses, determined that the amount should be classified as administrative expenses and transferred it to the overhead pool. On appeal, the Board held that this action was proper.
10. Of the $3,607.85 which plaintiff claimed for overhead, the cost inspector allowed $1,559.86, or 55 percent of the *71 amount which he had allowed for direct labor. This action was taken pursuant to Amendment No. 3 to the contract, providing for an overhead rate amounting to 55 percent of the charge for direct labor. Both the cost inspector and the Bureau disallowed the item of $2,659.45 for idle labor in its entirety. The Board held that this action was erroneous and that the idle labor should have been included in a computation of overhead expense in accordance with Amendment No. 4 to the contract. With respect to the meaning of this amendment, the Board held as follows:
$ H* * * $
In the opinion of the Board “items of allowable cost under this Section” as used in amendment No. 4 means both the items specified under section A (a) of the schedule for which Appellant is to be compensated “As Allowable Costs” and the items which under the contract would properly be regarded as constituting the allowable cost to which consideration should be given in computing and negotiating the overhead rate specified in section A (b). It will be noted that the derivation by the Bureau of Supplies and Accounts of an overhead rate, in terms of a percentage of direct labor dollars, based on the “actual allowable costs of the contract during the period,” necessarily produces the same result, dollarwise, as does the application of the contract interpretation here stated, provided identical allowable cost figures are used.
# * * # *
11. In its decision, the Board also held that the Bureau, in arriving at an overhead rate of 58 percent, had erred by eliminating various items of expense claimed by plaintiff, including charges for transportation and communications, expenses incurred for books and book bindings, and other expenses claimed under the heading “S. W. Marshall, Jr. Expense Account.” The Board decided that, while the item of $891.10 spent by plaintiff for conference meals should not have been allowed as a direct expense, the Bureau erred in failing to include this item as a part of the overhead expense.
The Board concluded that all costs of contract performance which were not reimbursable as direct costs but which were related to Government business should be included in the overhead pool.
*72 12. Upon receipt of the Board’s decision, the Bureau made a new computation and arrived at an overhead rate of 201.4665 percent of direct labor costs. On the basis of this computation, the defendant paid plaintiff the additional sum of $4,153.93 on the claim for precontract expenses on April 26, 1950. The overhead rate used was obtained in a manner which made no distinction among expenses incurred in direct connection with the contract, expenses incurred in connection with other work, and expenses of a general nature not falling specifically in either category.
13. Subsequent to the filing of this suit, the Bureau reexamined plaintiff’s costs for the precontract period and arrived at a new overhead rate of 244.0883 percent of the direct labor costs. On this basis, the Bureau calculated that the additional amount of $1,123.72 is due plaintiff on the claim.
14. An adjustment of plaintiff’s claim for precontract expenses in accordance with the decision rendered by the Board results in the following:
Contract Other Total
Direct cost (labor). $2,836.10 $2,290.85 $5,126.95
Other direct costs. 3,002.60 2,158.37 5,160.97
Overhead:
Idle labor. $4,027.78
Administrative salaries.. 2,495.00
Transportation.. 73.23
Conference. — .. 891.10
Other items.. 5,464.14
12,951.25 7,164.31 5,786.94 12,951.25
13,003.01 10,236.16 23,239.17
15.Although the Board’s decision did not specify the amount due plaintiff for his precontract expenses, neither of the parties returned to the Board for a final decision. It has not been established that its decision of January 31, 1950, was capricious, arbitrary, so grossly erroneous as to imply bad faith, or is not supported by substantial evidence. On the basis of that decision, plaintiff’s total allowable pre-contract expenses amounted to the sum of $13,003.01; $11,-552.49 thereof has been paid by defendant, and the balance due plaintiff is the sum of $1,450.52.
*73 Expense Aeooimt of 8. W. Marshall, Jr.
16.This claim of $4,630 is for expenses alleged to have been incurred personally by plaintiff in the performance of the contract and disallowed by the Bureau of Supplies and Accounts and by the Board. The claim includes the following items:
Theater tickets_ $64.00
Lunch íor New York liaison office_ 58. 75
Magazines and other expenses_ 59.14
181.89
Conference meals (in addition to per diem subsistence of $10 per day paid to S. W. Marshall, Jr.)_ 3,901. 27
Subsistence in excess of $10 per day specified in contract amendment No. 3 dated July 28,1947_ $546. 84
$4, 630.00
17. The first item of $64 was expended by plaintiff for theater tickets for two prospective consultants he planned to hire. The second item in the amount of $58.75 represents the cost of a luncheon which plaintiff gave to the employees in his New York office. These employees had been given termination notices on June 15, 1947, but the contract time was extended to August 31, 1947, and they were asked to remain on the job until that date. Plaintiff felt that the expenditure for the luncheon was a necessary employee welfare expense. The item of $59.14 consisted of expenditures for nontechnical magazines and other papers circulated among the employees, for a Silex coffee pot in the New York office, for advance payment on a hotel room which was not used, and for miscellaneous items. After the Bureau had refused to reimburse plaintiff for these expenditures, the Board on appeal held that the cost of the theater tickets was not reimbursable under the terms of the contract and that if the other items claimed could be considered as necessary to the performance of the contract, they belonged in the overhead pool.
18. The last item in the claim is for subsistence expenses personally incurred by plaintiff in excess of the $10 per diem which he was allowed by the terms of Amendment No. 3 to *74 the contract. Amendment No. 8 was executed on July 28, 1947, as a result of negotiations between the parties with respect to the amount of subsistence which plaintiff should be allowed while traveling on contract business. At that time, the amount here claimed for subsistence had already been spent. However, plaintiff agreed to accept a per diem of $10 per day in lieu of his actual costs for subsistence, because he did not have sufficient records and receipts to establish that his expenses for subsistence were more than $10 a day. The Board held that plaintiff was bound by the per diem limitation set forth in the contract.
19. The major item of $3,901.27 consists of expenditures for luncheons and dinners for the plaintiff and for his employees and consultants in 1947. Plaintiff had employed a number of scientists to assist him on the contract work, and from tipie to time he invited them to luncheons and dinners during which he discussed contract business. He had followed a similar practice in his private business. On occasions plaintiff also invited other employees to luncheons at which matters pertaining to the contract were discussed. The average cost of the conference meals paid for by plaintiff was $3 per meal. In January 1947, there were 25 conferences and 89 meals; in February, 22 conferences and 72 meals; in March, 16 conferences and 56 meals; in April, 16 conferences and 61 meals; in May, 24 conferences and 81 meals; in June, 28 conferences and 92 meals; in July, 37 conferences and 97 meals; in August, 24 conferences and 70 meals; in September, 24 conferences and 61 meals; and in October, 16 conferences and 35 meals. For at least a third of the time during which their meals were paid for by plaintiff, the employees and consultants were in travel status and were compensated for their subsistence at the per diem rate as specified in the contract. While the parties were carrying on negotiations which resulted in the establishment of the overhead rate stated in the contract, plaintiff was warned that his expenditures for conference meals were not reimbursable.
20. On appeal, the Board held: (1) that the contract contained no express or implied provision for reimbursement of the cost of the conference meals as a direct cost; (2) that it had not been shown that the cost of the meals was reason *75 able and necessary to the performance of the contract, and (3) that sncb expenditures for meals are normally regarded as administrative expenses and that if so regarded here, plaintiff had been reimbursed for such costs through payments made pursuant to the negotiated 55 percent overhead rate provided for in the contract.
21. The decision of the Board was not arbitrary, capricious or grossly erroneous and is supported by substantial evidence.
Accountants’ Fees
22. During the performance of the contracts, plaintiff had an office manager whose duties included the supervision of the cost records and whose salary was treated as an overhead cost allocable to the contract. Plaintiff also had a bookkeeper and 95 percent of the bookkeeper’s salary was treated as a direct cost of the performance of the contract. In addition, plaintiff employed certified public accountants to render special services for him, both during the period of the contract and subsequent thereto.
Section A (a) 4 of the schedule to the contract provided that expenditures for outside professional services directly related to the contract would be classed as allowable direct costs.
23. Plaintiff submitted invoices totaling $3,988.99 for fees paid to outside accountants for services rendered by them during the performance of and after the completion of the contract. After the invoices had been disallowed by the cost inspector, the Bureau of Supplies and Accounts paid plaintiff for all accounting fees incurred up to the date the contract ended. By a negotiated settlement covering costs relating to the final administration of the contract, all the remaining items in the claim were disposed of with the exception of one item described as follows:
Revision of CPA audit to include February and March 1948, preparation of final invoice on contract, conferences with Navy Department in Washington in August and September 1948, and visit to SOI-CA in Chicago to present and explain final invoice (dated September 6, 1948)_ $700
24. The amount claimed represents the fee which plaintiff paid to a certified public accountant for services rendered *76 during August and September 1948. The services included the preparation of a final invoice and attendance at conferences held with Navy employees in Chicago and Washington. The final invoice was prepared and submitted under date of September 8, 1948, approximately a year after the termination of the contract. On February 11, 1948, plaintiff had submitted an invoice listing total disbursements up to January 31, 1948, of $352,131.38, whereas the final invoice listed total disbursements of $356,962.13, or approximately $4,000 additional for expenditures in February and March 1948. Most of the accountant’s work on the final invoice consisted of making adjustments in various disputed accounts, which had been disallowed by the Bureau of Supplies and Accounts, were involved in the appeals to the Board, and are included in this action.
25. The Board denied the claim in a decision dated May 29,1950, which read in pertinent part as follows:
The costs in question represent fees paid to certified public accountants in revising an earlier voucher to include post-contract expenses over and above those which had already been disallowed, and in conferring with representatives of the Bureau of Supplies and Accounts. The work was performed immediately following the receipt by Appellant from the Cost Inspector of a dis-allowance of post-contract expenses, almost a year after the completion of productive work under the contract and more than four months after Appellant’s books were closed insofar as the contract was concerned. It seems clear that the only necessity for outside accounting services at that time was in connection with the advocacy of Appellant’s position in a dispute which had arisen with representatives of the Navy. The costs were not, in the opinion of the Board, incurred “in the performance of the contract” within the meaning of section 3 of the contract. During the period of performance of this contract Appellant had little other work of consequence. It would appear that the services of the bookkeeper and the office manager, the cost of which was almost entirely charged to the contracts, should have been entirely adequate to maintain sufficient records for the determination of costs under the contract, certainly when supplemented by the accountants’ services for which Appellant has already been reimbursed. Insofar as the claim is for services in connection with the addition of minor costs incurred in February and March of 1948 to a voucher *77 which had already been prepared, there is no basis for concluding that such work required the services of an expert accountant.
26. The decision of the Board was not arbitrary, capricious, or grossly erroneous. It is supported by substantial evidence.

Additional Jo'b Costs

27. Beginning in October 1946, and from month to month until the contract ended on October 31, 1947, plaintiff submitted invoices of his costs as they were incurred. No claim for additional job costs was made until January 10,1948. It was in the amount of $30,541.30 and covered the calendar year 1947. On February 11,1948, plaintiff submitted another invoice in which he requested payment of $32,291.36 for additional job costs incurred during 1947. He did not supply an itemization of the additional job costs claimed until he submitted his final invoice of September 8, 1948. In that invoice, the amount claimed as additional job costs was reduced to $20,438.71. The claim covered the period January 1,1947, to October 31,1947, and was itemized as follows:
Direct labor-$5,663.06
Overhead- 3,506.58
Other direct charges:
Cost of reports_ $408. 01
Communications_ 1, 025.27
Library books_ 38. 61
Transportation and subsistence_ 4, 930.02
Precontract expense_ 91. 44
Professional and scientific services_2,107.34
Security_ 673. 90
Automobile expenses_ 1, 656. 28
Expense account, S. W. Marshall_ 1,988. 20
Total other direct charges_12,919. 07
Total additional job costs_z._ 22, 088.71
Less income from fees other than contract_ 1,650. 00
Total amount claimed as additional job costs_ 20, 438. 71
28.The claim was denied by the Bureau of Supplies and Accounts on the ground that plaintiff had failed to establish by documentation and accounting data that the items *78 claimed were proper charges under the specific compensation provisions of the contract. Plaintiff filed a timely appeal to the Board and testified at the hearing before the Board. With regard to the absence of any documentary or accounting data to support the items claimed, plaintiff testified:
Now, with respect to the different categories of items comprising this claim, we have never said and I do not now say that the data which we have supports that these items were spent directly on this contract. What we do say, what we do claim, is that these costs are reasonable; that these costs arose from our performance of this contract ; that the records are and were available to determine whether the monies spent were reasonable sums of money to spend.
Also, with respect to whether the additional job costs should have been claimed by plaintiff under the several captions of Section A (a) of the schedule of the contract (the specific compensation provisions), plaintiff testified at the hearing before the Board as follows:
We are certain in our own minds that they should not be. The origination of these costs, the conditions under which the costs were incurred, the manner in which the records themselves were kept, were separate and distinct from the normal costs provided for by the captions of the contract.
29. On November 24,1954, the Board denied the claim by a decision which read in pertinent part as follows:
On the one hand, Section A (a) of the Schedule of the contract expressly covers certain categories of direct costs. Most of the items of “additional job costs” are described by the claim in terms which have also been applied to various items heretofore claimed and allowed as direct costs under Section A (a). Thus, to the extent that the “additional job costs” may be direct costs as stated in the claim and may be within the categories of Section A (a), Appellant has failed to show any basis for their allowance and direct payment, and the Board has found none on the evidence. On the other hand, the express provisions of Section A (b) of the Schedule of the subject contract, as amended tollo wing the overhead rate negotiations occurring in May 1947, provide for payment of an amount equal to 55% of direct salaries and wages (exclusive of overtime) “to cover all overhead, indirect charges and all elements of cost excluded *79 from or not covered by” Section A (a) of the Schedule. Thus, alternatively to the extent that the “additional job costs” may be indirect costs, as is perhaps more consistent with Appellant’s own testimony and other evidence, or may be costs not covered by Section A (a) even though direct costs, such “additional job costs” are, by the agreement of the parties as expressed in Section A (b), covered by the amount payable as overhead. The amount of the overhead payment is determined by the application of a rate reached by negotiation, reflecting the compromise of conflicting interests; and there is no evidence of any understanding that Appellant’s “additional job costs,” if considered prima facie indirect or not covered by Section A (a), would nevertheless, be directly reimbursed as now proposed by Appellant. If Appellant felt that the unfavorable cost situation which accompanied the absence of non-Navy revenue was a factor to be accorded special consideration, whatever the character of the costs involved, he failed, nevertheless, to preserve that position in negotiations, and did not seek remedies under the contract despite opportunities which existed.
30. In 1947, plaintiff had a small amount of private business in addition to the work which he was doing for the Navy. The additional job costs now claimed were not originally allocated on plaintiff’s books to the Navy, but after the contract ended, the allocation of such costs was changed from firm business to Navy business on the advice of plaintiff’s auditors. Under date of September 8, 1948, the accountants employed by plaintiff completed and delivered to him an audit of his records covering the period from April 1,1946, to March 31,1948. The audit report (in evidence as plaintiff’s exhibit 16) discloses that plaintiff’s total expenditures in the period from January 1, 1947, to October 31,1937, were $223,101.29. Prior to the completion of the audit, $183,225.62 was allocated to the. Navy contract and $39,875.67 was not allocated to the contract. During the audit of plaintiff’s records, an item labeled “additional job costs” of $29,061.25, together with an item designated “private aircraft expense” of $6,472.24, was transferred and allocated to the Navy contract for the period January 1, 1947, to October 31,1947. Other transfers and adjustments were made, and when these were completed, the audit report *80 showed that of the total of $223,101.29 expended by plaintiff during the period mentioned above, $218,759.11 had been allocated to the Navy contract and $1,342.18 had been allocated to plaintiff’s private business. The $20,438.71, now claimed as additional job costs, was included in the total of $218,759.11 charged on plaintiff’s books to the Navy in 1947. The same audit report discloses that plaintiff’s cash receipts from the Navy on the contract involved here from January 1, 1947, to October 31, 1947, amounted to $214,108 or to $3,999.11 less than the total charged to the Navy in the same period. In the absence of any evidence to the contrary, the audit report indicates that plaintiff has already been reimbursed for most of the amount claimed in this suit as additional job costs.
The record, as a whole, establishes that the decision of the Board was not arbitrary, capricious, or grossly erroneous. The decision is supported by substantial evidence.

Primate Aircraft Expense

31. Plaintiff claims the sum of $5,360.47 as the balance due on expenses incurred in the operation of his privately owned aircraft in the performance of the Navy contract. Plaintiff’s initial claim for the operation of the privately owned aircraft was $17,965.69. He has been paid the sum of $13,501.23, thus reducing the unpaid balance on the claim to $4,464.56 instead of $5,360.47 as stated in the petition.
32. Section A (a) (9) of the schedule to the contract included, among allowable costs, the following:
Expenditures incurred for the use of Contractor-owned private aircraft required for the performance of this contract, charged in accordance with a sound accounting method consistently followed by the contractor.
33. Plaintiff purchased two military surplus airplanes for the purpose of using them in connection with the contract work. The first airplane, a Cessna, was purchased by plaintiff in June 1946. After being converted and repaired, it was delivered to plaintiff in September 1946. At that time, its logbook showed that it had been manufactured in 1942 and had flown a total of 813:10 hours. During the period the *81 contract was performed, this airplane was flown a total of 464:50 hours.
34. The second airplane was purchased by plaintiff in September 1946 shortly after he had been directed by the Navy to set up a liaison organization with the central office in New York City which was to have dealings with aircraft manufacturers throughout the United States. Plaintiff believed that the contract work, other than the liaison activities, would require the use of one airplane and that another one would be needed for the engineer-pilot whom the plaintiff hired and placed in charge of the liaison office. On or about January 1,1947, it became apparent that the aircraft manufacturers would not use the services of the liaison office, but plaintiff was not directed by the Navy to close the office. Since office space had already been leased in New York, plaintiff, on his own initiative, decided to transfer other contract activities to the New York City office on February 1, 1947. The conversion and repair of the second airplane required a long period of time, and it was not delivered to plaintiff until about the end of May 1947. It was flown for a total of only 59 hours between the date of delivery and the date the contract ended.
35. On September 8, 1947, plaintiff conferred with representatives of the Navy for the purpose of arriving at a basis for charging the cost of the plaintiff’s privately owned aircraft to the contract. Both parties agreed that plaintiff would furnish data showing the hours each plane had been used under three headings: use on the contract, personal use of the contractor, and test and ferry time (considered unproductive flight time). The rate per useful hour was to be determined by dividing the cost, including operating cost and depreciation, by the flight hours, exclusive of test and ferry time. Plaintiff was to be reimbursed at the rate so determined for the hours each plane was used on the Navy contract.
36. On August 29, 1948, both planes were destroyed as the result of the collapse of a hangar roof during a wind storm. Plaintiff collected $4,150 insurance for the destruction of the first plane but nothing for the second.
*82 37. A dispute arose between the parties with respect to: (1) the classification of 25:30 flight hours designated bj plaintiff as test and ferry time; (2) the allowable rate of depreciation on the airplanes, and (3) the refusal of the cost inspector and the Bureau of Supplies and Accounts to allow any costs incurred in connection with the second airplane as a part of the cost of performing the contract.
38. During the period from September 4, 1946, to February 17, 1947, plaintiff made several flights in the first airplane, partly for the purpose of testing the aircraft and partly for consulting scientists on contract matters. The 25:30 hours flown were designated by plaintiff as test and ferry time, but the Navy cost inspector reclassified such flight time as chargeable personally to plaintiff.
39. In computing depreciation on the first aircraft, plaintiff deducted 15 percent from the acquisition cost of $8,000 as initial depreciation and then deducted an additional $2,500 for the salvage value of the aircraft.. The remaining $4,300 was then spread over the remaining useful flight hours, calculated by deducting the hours used prior to acquisition from an assumed 1500-hour useful life. This resulted in a depreciation per flight hour of $6.2606. In the same way, the depreciation per flight hour on the second airplane was calculated at $6.4052 per flight hour. Plaintiff modified his claim for depreciation after the planes were destroyed by subtracting the salvage value from acquisition costs and spreading the balance over the actual number of hours the planes were flown. Under this computation, the depreciation and obsolescence claim for the first airplane was $4,727.57 and for the second airplane was $955.74.
40. The Navy cost inspector calculated the depreciation on the first airplane by adding the cost of the overhaul to the purchase price and by assuming that the plane had a useful flying life of 1500 hours after the overhaul but no residual value thereafter. In this way, the total depreciation he allowed amounted to $2,929.50.
41. With respect to the second airplane, the Navy cost inspector ruled that it was not necessary to the contract performance and that none of the costs incurred in connection with it were chargeable to the contract.
*83 42. As a result of the exceptions taken by the cost inspector, it was determined that plaintiff’s allowable costs for the use of his aircraft amounted to $11,834.77 instead of the $17,965.69 claimed by plaintiff. When the disallowances were sustained by the Bureau, plaintiff appealed and the Board held in substance as follows:
(1) The purchase and use of the second airplane was necessary to the performance of the contract, and hence plaintiff’s claim for depreciation on the basis of 59 hours’ actual use of that plane during the performance of that contract should have been allowed and the hours flown by it used in computing the rate per useful hour.
(2) The action of the cost inspector and the Bureau in reclassifying 25: 30 hours of flight time in the first airplane as personal time instead of test and ferry time, as claimed by plaintiff, was erroneous.
(3) The cost inspector’s determination as to the probable useful life of the aircraft was reasonable and should be used for calculating the depreciation of both airplanes but that the cost of the major overhaul should be amortized over a period of less than the 1,000 hours chosen by the inspector.
The Board remanded the case to the Bureau of Supplies and Accounts for recomputation in accordance with the principles laid down in its decision. The parties did not return to the Board for a final decision.
43. Following the decision of the Board, the Bureau of Supplies and Accounts made an additional computation and determined that the total allowable cost for the use of the aircraft was $13,501.23, and plaintiff was paid in accordance with that determination. Since this action was filed, the defendant has made an additional computation and determined that plaintiff is entitled to a further payment of $89.63.
44. Although there are several methods which might have been used for arriving at the depreciation on the two airplanes, the evidence does not establish that the decision of the Board was arbitrary, capricious, or grossly erroneous. It is supported by substantial evidence.
*84 45.The following is a statement of plaintiff’s allowable costs incurred in the operation of his aircraft, calculated in accordance with the Board’s decision:
NO 52892 NO 75991
Combined
Hrs. Min. Hrs. Min,
Flight hours at acquisition. 1,500 1,500 00
Use contract 464 59 00
Test and ferry time. — . 75 34 15
Productive hours_ 45
Personal use.. 00
Contract use. 354 35 45
Cost at acquisition... $8,848.34 $7,995.15
Depreciation (rate per hr.).. 5.3301
Amount. 2,742.00 314.48
Amortization of cost of engines transferred. 464.83
Operating costs..... 10,434.41 1,345.42
Total depreciation and operating costs— 13,641.24 1,659.90 $15,301.14
Cost per hour. 35.052 67.067
Contract costs..... 12,428.84 1,592.84 14,021.68
Deduct:
Credit for nonemployee travel.. 358.15 358.15
Allowable costs... 12,070. 69 1,592.84 13,663.53
Payments received by plaintiff. 13,501.23
Additional due plaintiff. 162.30

Unliquidated Damages for Breach of Contract

46. Plaintiff seeks recovery of general damages in the sum of $150,000 on the ground that defendant breached the contract by delaying the payment of plaintiff’s monthly invoices beyond the 30-day period specified in Section 3 (c) of the contract and by excepting to numerous items included in plaintiff’s bills and withholding substantial amounts of money due plaintiff for long periods of time.
Section 3 (c) of the contract required the Navy to make provisional payments on plaintiff’s monthly invoices within 30 days after the submission of each invoice, hut each provisional payment was subject to reduction where the invoice was found to include items that did not constitute allowable costs. Section 3 (c) also provided for audits to be made by the Bureau of Supplies and Accounts and for adjustments in the amounts payable to plaintiff on the basis of information disclosed by the audits.
47. Plaintiff’s first invoice was dated October 2, 1946, and covered expenses incurred in the performance of the contract *85 during the months of July, August, and September 1946. Thereafter, plaintiff submitted invoices at the end of each succeeding month. The invoices were sent to the New Orleans office of a Navy cost inspector who represented the Bureau of Supplies and Accounts. The cost inspector reviewed the invoices in the light of his official instructions and the provisions of the contract as he interpreted them.
The cost inspector customarily approved the invoices for payment on a provisional basis, less reductions for exceptions taken by him because of information appearing on the face of the invoice. From time to time, the cost inspector audited plaintiff’s books in Dallas, Texas, and, as a result of the audit, exceptions which he decided should have been taken on previous invoices were applied to current invoices. At the same time, plaintiff was credited with reductions made for exceptions previously taken where he could establish that the expenditure was authorized by the terms of the contract or had been authorized in writing by the contracting officer. When the audits were made, the cost inspector required plaintiff to support all costs claimed by documents which, in the judgment of the inspector, were sufficient to show that the amounts claimed had been expended, were within the categories of allowable costs as defined by the contract, and had been spent on contract work rather than on other work performed by the contractor.
After completing his review of each invoice, the cost inspector certified it for payment in the amount approved by him. The invoice was then mailed to his superior, a supervisory cost inspector in the Chicago office of the Bureau of Supplies and Accounts who had the authority to reject and return the invoice on the basis of his review thereof. However, if he approved it, the invoice was then forwarded to the Washington, D. C. office of the Bureau for payment.
From time to time the cost inspector sent plaintiff written notice of the exceptions and disallowances resulting in reduced payments.
48. Except for two invoices which were paid approximately 30 days after they had been submitted, the defendant regularly and repeatedly breached the contractual provision *86 requiring it to make provisional payments on invoices within 30 days.
The following table shows the date and amount of each invoice submitted by plaintiff from October 2,1946 to October 8,1947, the date and the amount of each provisional payment on the invoices and the amounts suspended:
No. 466 Invoice Provisional payment
Date Amount Date Amount Payment suspended
A.. Oct. 2.1946 $17,716.44 Dec. 16,1946 $17,716.44
B_. Nov. 16.154.43 Jan. 27,1947 16,154.43
0_. Dec. 11.1946 17,119.58 Feb. 5,1947 12,020.53 $5,099.05
D.. 20.1947 22,890.15 Apr. 18,1947 22,783.97 106.18
E_. Feb. 25.1947 32,339.38 May 12,1947 19,041.87 13,297.51
F_. Mar. 11.1947 20,954.70 Apr. 14,1947 17,025.63 3,929.07
G_. Apr. 9.1947 27,003.08 July 15,1947 18,730.90 8,272.18
EL. May 8.1947 21,017.45 Aug. 21,1947 5.759.83 15,257.62
I._. June 14.1947 17,502.05
J__. July 10.1947 23,722.61
KL. Aug. 9.1947 16.712.43 .do. 13,300.53 2,411.90
L_. Sept. 30.1947 11,952.48 .do. 5.689.84 6,262.64
ML. Oct. 8.1947 14,312.50 Jan. 9,1948 5,458.30 8,856.20
Total,. 258,397.28 163,348.38 115,089.31
49. As shown by the table in the foregoing finding, the cost inspector’s exceptions to the amounts claimed in plaintiff’s invoices during the period of contract performance aggregated $115,089.31. In many instances, the suspended items were reinstated and paid to plaintiff after a considerable lapse of time. A schedule showing the reason for the exceptions taken to plaintiff’s invoices and the dates when and the extent to which the exceptions were later reinstated is in evidence as defendant’s exhibit 2, which is made a part hereof.
The exceptions taken to plaintiff’s invoices and the resulting delays in payment of the costs claimed by him were occasioned by several factors.
The delays that are chargeable to the plaintiff were caused by his failure to obtain the advance approval of the contracting officer for categories of expenditures which required advance approval, by exceeding the maximum amount specified in the contract, and by making claims for expenses incurred after the expiration of the contract. Some delay was also occasioned by plaintiff’s failure to document his claimed costs as required by the cost inspector.
*87 When the Navy cost inspector authorized provisional payments on plaintiff’s invoices, the inspector followed the practice of withholding 10 percent of the amount of the invoice as a reserve against disallowances which might be taken after an audit of plaintiff’s records. This practice was not authorized by the contract and, since periods of from three to four months frequently elapsed between audits, payment of the amounts withheld was delayed to that extent. On many occasions during the period of performance, the contracting officer and plaintiff conferred together and agreed upon the terms of proposed contract amendments which increased the maximum amount that could be paid the contractor or authorized him to incur expenses for purposes not otherwise reimbursable. However, it took the Navy a period of 90 days or longer after an oral agreement was made to issue a written amendment, and, since the Navy cost inspector would not approve such costs until he received a copy of the amendment, reimbursement of the costs involved was delayed until the amendment was delivered to the inspector.
Some delay also was caused by the vagueness of the contract provisions respecting subcontracts entered into by plaintiff, and the dispute between the parties as to the meaning of such provisions. Section 4 (a) 1 required plaintiff to obtain the prior approval of the contracting officer as a condition to being reimbursed for any contract or purchase order involving research or development work, and Section 4 (a) 6 required such prior approval of the contracting officer for any subcontract purchase order involving the payment of more than $1,000. Besides the engineers regularly employed by him, plaintiff made arrangements with a number of independent scientists and engineers to perform research and other work in their laboratories or places of business. He agreed to compensate the scientists at a fixed rate per hour for their services and contended that no subcontracts were involved. The defendant took the position that any scientist was a subcontractor if he was allowed to perform the work at his own place of business. The contract was classified as confidential and the Navy required that the scientists be investigated and cleared by its security officers. The contracting officer also insisted on approving *88 the agreements with the scientists in order to satisfy himself that each individual engaged was competent and the fee charged by him was reasonable. Plaintiff did not obtain approval of the contracts in advance and reimbursement of the fees paid by him was delayed for about three months pending the contracting officer’s approval.
50. As stated in finding 4, plaintiff completed all of the work required of him under the terms of the contract on September 30,1947, 30 days before the date fixed for the expiration of the contract.
From July 1,1946 to September 30,1947, the period during which the contract was performed, plaintiff’s total contract costs, as invoiced to the Navy, were $244,084.78. These expenses were financed principally by temporary bank loans and by the payments received from the Navy. On October 2,1946, when plaintiff submitted his first invoice, his debt to the bank amounted to $40,000. The aggregate of the loans made to him by the bank to September 30,1947, was $275,100. Plowever, by that date the Navy had paid him a total of $231,824.44, or all but $12,260.34 of the total invoiced to the Navy. Most of the sums paid by the Navy were applied on the bank loan which had been reduced to $67,055.08 on September 30, 1947.
Because of defendant’s failure to make provisional payments on plaintiff’s invoices within the time fixed by the contract and because of other delays in payment attributable to it, plaintiff was compelled to borrow more money from the bank and to pay greater interest charges thereon than would have been required had the delays not occurred.[1] However, aside from the additional interest which plaintiff paid on his bank loans, the evidence is not sufficient to establish the amount of loss or damage, if any, which he sustained because of the defendant’s delay in making the payments due under the contract during the period from July 1,1946 to September 30,1947.
51. On November 10, 1947, plaintiff submitted an invoice covering the last month of the contract period. It was in *89 the amount of $54,143.28 and was composed largely of plaintiff’s claims for precontract expenses and for his personal traveling and subsistence accounts, both of which claims are in issue here. During the period between December 10,1947 and September 18, 1948, plaintiff submitted four additional invoices to the Navy in which he claimed an aggregate of $44,421.57. These invoices did not represent any new or additional work performed on the contract after it had expired. They consisted of costs which the Bureau of Supplies and Accounts had rejected as not allowable under the terms of the contract or of additional charges which plaintiff reallocated on his books and charged to the Navy after a review and audit of his accounting records.
As of February 11, 1948, the plaintiff had invoiced the Navy for a total of $352,131.38, although the contract maximum was $270,756.68. On May 10,1948, after the Navy had audited plaintiff’s books to determine whether any additional amounts claimed were allowable expenses, plaintiff was paid the further sum of $11,648.18. This brought the total amount paid to $268,049.11 and, since the Navy retained a reserve of one percent until a final release was executed by plaintiff, no further payments could be authorized. However, by Amendments Nos. 6 and 7, dated June 11 and June 22,1948, the maximum amount of the contract was increased to $350,000. The purpose of these amendments was to enable the plaintiff to recover any additional costs which were properly chargeable but which had not been paid because of lack of documentary support, or because the expenditures had not been authorized by the contracting officer. After these amendments had been executed, the Bureau of Supplies and Accounts made additional payments to plaintiff, totaling $13,611.23. As a result of appeals to the Board on disputed accounts, plaintiff received the following additional payments:
$2,000 for aircraft expense
$3,820.39 for precontract expenses
$1,751.14 for automobile expense
$1,593.93 for Christmas and vacation bonus.
Plaintiff also claimed that postcontract expenses amounting to $36,093.16 and incurred by him in the period from *90 October 31,1947 to March 31,1948, were properly chargeable to the contract. The Bureau of Supplies and Accounts refused to audit or allow any of such costs, but on appeal the Board held that the Navy had not intended by establishing a completion date of the contract to cut off the reimbursement of costs thereafter incurred, if such costs were in fact necessary for or incident to the performance of the contract, and that the Bureau of Supplies and Accounts had no legal basis for refusing to audit and determine the allowability of costs necessary for the complete performance of the contract. Subsequent to the Board’s decision, plaintiff’s books were audited, and on June 29,1949, the parties negotiated a written settlement by which plaintiff received $26,500 on his claim for postcontract expenses.
Through all of the above-described payments, plaintiff received a total of $317,325.80 of the aggregate of $356,962.13 claimed by him.
52. As of April 30, 1946, plaintiff had about $45,000 cash in banks and owned 2,000 shares of stock which he had acquired at a cost of $70,186.72. He also had an engineering organization with offices located in New York, Chicago, Washington, Dallas, and Los Angeles. Sometime prior to July 31, 1946, plaintiff pledged the 2,000 shares of stock to the bank as collateral security for the money loaned to him for financing operations under the contract. On June 24, 1948, the bank notified plaintiff that it had sold the stock for $50,169.37 and applied the proceeds of the sale to his outstanding indebtedness to the bank. The stock was sold for $20,017.35 less than plaintiff paid for it. About May 1,1948, plaintiff’s financial condition was such that he was compelled to close all of his offices with the exception of his Dallas office.
53. At the inception of the contract, plaintiff was operating five offices in five different cities at a cost for rent and personnel of more than $50,000 per year. The contract did not require plaintiff to devote his full time to the contract work, and only about 55 percent of the time of his regularly employed personnel was spent on the Navy contract. Plaintiff had planned to secure a considerable amount of outside work while the contract was being performed, but it developed that the expenses he incurred in prospect of secur *91 ing outside work far exceeded the income from that source. On May 8, 1948, after plaintiff had been compelled to close all but one of his five offices, he wrote the Secretary of the Navy that during the contract period his expenses for other than Navy work amounted to $30,652.20; that the only income received from outside sources amounted to $4,836.50, and that his loss on noncontract activities during that period was $25,815.73. According to the audit prepared by plaintiff’s accountants in September 1948, his total income from noncontract sources in the precontract period (April 1, 1946 to June 29,1946) was $5,193.87. As stated in finding 14, his expenditures chargeable to non-Navy work during the same period were $10,236.16. In the postcontract period, November 1,1947 to March 31,1948, plaintiff had no income except the payments made by the defendant. His expenses during that period, as determined by his accountants, amounted to $47,336.68. Under the agreement of June 29, 1949, $26,500 of such costs was paid by the Navy, leaving a loss of more than $20,000 chargeable to noncontract activities during the postcontract period.
54. As stated in finding 50, plaintiff’s outstanding indebtedness to the bank had been reduced to $67,055.08 on September 30, 1947, when he completed all the work under the contract. However, between September 30,1947 and June 8, 1948, plaintiff borrowed an additional $60,461.28 from the bank. During the same period of time the $36,224.67 he received from the Navy was applied to the loan, thus reducing it to $91,291.69 as of June 24, 1948, when the bank sold the stock pledged as security for plaintiff’s loan. At the time the stock was sold, the maximum amount of the contract was $270,756.68 and plaintiff had been paid $268,049.11 by the defendant.
55. Plaintiff has not shown by a preponderance of the evidence that the damages he sustained through the loss of his stock and the liquidation of his four offices were the direct and proximate results of the defendant’s breach of contract. Plaintiff’s work on the contract and the efforts he made to collect the amounts claimed to be due him from the Navy required most of his time during the contract period, but the engineers and other personnel employed in his five *92 offices had almost one-half of their working time available for the solicitation and handling of non-Navy business. There is no evidence as to what outside business plaintiff would have obtained or the profits he would have earned therefrom had there been no delay by the defendant in reimbursing plaintiff for the costs due him under the contract.

Summary

56. On the basis of the foregoing findings, plaintiff is entitled to recover the following:
1 percent reserve withheld by defendant_$3, 500. 00
Balance of precontract costs_ 1,450.52
Balance of private aircraft expense_ 162.30
5,112.82
CONCLUSION OF LAW
Upon the f oregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States five thousand one hundred twelve dollars and eighty-two cents ($5,112.82).

 In plaintiff’s first amended petition, his claim for damages included $7,536.58 for interest on loans. This claim has been abandoned in view of the decision in Ramsey v. United States, 121 C. Cls. 246.